2009 ME 8

**STEWART TITLE GUARANTY COMPANY**

v.

**STATE TAX ASSESSOR.**

Supreme Judicial Court of Maine.

Argued: Sept. 10, 2007.
Decided: Jan. 20, 2009.

G. Steven Rowe, Attorney General, Scott W. Boak, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, ME, for the State Tax Assessor.

Thimi R. Mina, Esq. (orally), McCloskey, Mina, Cunniff & Dilworth, LLC, Portland, ME, for Stewart Title Guaranty Company.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, and MEAD, JJ.

LEVY, J.

[¶ 1]  The State Tax Assessor appeals from a summary judgment of the Superior

Court (Kennebec County, *Studstrup, J.*) vacating the Assessor's premium tax assessment against Stewart Title Guaranty Company for the tax years 1999 through 2002. The Assessor asserts that the Superior Court misinterpreted the meaning of the term "gross direct premiums" as used in 36 M.R.S. § 2513 (2008).[1] We vacate the judgment and remand for entry of judgment in favor of the Assessor.

## I. CASE HISTORY

[¶ 2] This case concerns the application of a tax statute, 36 M.R.S. § 2513, which imposes a tax on insurance premiums charged by, among others, title insurance companies doing business in Maine. Section 2513 authorizes the State Tax Assessor to assess against title insurance companies a two percent tax on "gross direct premiums" charged to the insurers' customers in Maine. At issue in this case is the definition of "gross direct premiums," and whether that term encompasses title examination fees collected by a title insurer's agent.

[¶ 3] Stewart Title is a title insurance underwriter based in Texas. It is relatively unique within the industry in that it only insures title risks, and does not conduct title examinations or perform closing-related services such as document preparation and acting as an escrow agent. Instead, Stewart Title contracts with independent and affiliated agents for these functions. In Maine, Stewart Title's only affiliated agent is Stewart Title of Northern New England (STONNE), which has offices in Maine and New Hampshire. Stewart Title and STONNE are both subsidiaries of Stewart Information Services Corporation, a holding company.

[¶ 4] Stewart Title has been selling title insurance policies in Maine since at least 1987 and has reported its financial information to the Maine Revenue Services using the standardized "Schedule T" form provided by the National Association of Insurance Commissioners (NAIC), as required by the Assessor. The NAIC instructs title insurers to report as "direct premiums written" the entire amount charged to consumers at closings, exclusive of escrow services, regardless of whether only a portion of the charge is remitted to the insurer as a premium.[2] Accordingly, Stewart Title has reported on its Schedule T filings 100% of the amount charged to insured customers, and not the portion of the charges it actually receives from its agents.[3] A percentage of the

1. Title 36 M.R.S. § 2513 (2008) has been amended since the tax years at issue in this case. The amendments do not affect the term "gross direct premiums," and are therefore not relevant to our analysis. *See* 36 M.R.S.A. § 2513 (1990 & Supp.2002).

2. The NAIC also instructs insurers and regulators that the data reported on the Schedule T of the insurers' annual income statement is not intended to be used for the calculation of the amount of any state premium taxes that may be due. It advises that "[i]n the event the basis used for the calculation of the premium tax differs from the basis required for reporting in the annual statement," insurers should submit a separate schedule to state premium tax collection agencies in support of their premium calculations.

3. The Schedule T contains the following instructions that explain how an insurer should report premiums for "all the functions necessary to insure the risk and to issue a title insurance policy":

(1) GROSS ALL–INCLUSIVE PREMIUMS—Under this method of reporting direct premiums written, the title insurer and its title agent generally perform all the functions necessary to insure the risk and to issue a title insurance policy. The title insurer reports 100% of the premiums charged either through its branch office or its title agents. Direct premiums written reported under this method generally contemplates the following factors in the rate-making process:
    1. Cost of the title search/examination.

amount paid to Stewart Title's agents by a customer is defined by contract as the "gross risk rate premium," which typically amounts to between 10% to 40% of the total amount collected from the customer, except with regard to amounts collected for extra-hazardous risks.

[¶ 5] Stewart Title has submitted with its completed Schedule T forms a separate schedule explaining its basis for computing the premium tax. The computation shown on the separate schedule submitted for the 1999 tax year is representative of the approach Stewart Title adopted for all the tax years in dispute:

| | |
|---|---|
| Total amount per Schedule T: | $3,336,214 |
| Less: charges made by non-direct agents: | $2,304,691 |
| Total premiums subject to tax: | $1,031,523 |

Stewart Title has paid Maine taxes based on the total premiums after deducting the amount it characterizes as "charges made by non-direct agents," and not based on the total amount charged. From 1987 through 2002, the State Tax Assessor accepted Stewart Title's calculations and tax payments without challenge.

[¶ 6] Beginning in 2002, the Maine Revenue Services notified Stewart Title that it owed additional taxes for 1999, 2000, 2001, and 2002. The Assessor claimed that the underpayment resulted because Stewart Title calculated the tax it owed on the net amount that Stewart Title received from its agents rather than the total amount reported on its Schedule T.

[¶ 7] Stewart Title sought reconsideration of the assessment pursuant to 36 M.R.S. § 151 (2008). As indicated in its written submission concerning the 1999 tax year, it asserted that the deduction it had taken from the total amount of the premiums it had reported on its Schedule T "represents title search and examination fees paid by the insureds to the local title agents upon which the agents pay a tax to Maine." [4]

[¶ 8] The Director of the Appellate Division of the Maine Revenue Services issued a written decision denying the petition. The decision framed the issue presented as "whether charges for title search and examination that are paid by the insured to the Taxpayer's independent agents, and reported as insurance premiums for insurance regulation purposes, are gross direct premiums subject to tax under 36 M.R.S.A. § 2513." The decision noted that Stewart Title's contract with its agents required the agents to share a portion of the charges for the title services with Stewart Title. [5] The

---

2.   Policy issuing cost.
3.   Amount retained by or commission to its agents/abstractors/attorneys.
4.   Overhead and miscellaneous expenses.
5.   Expected losses and LAE from underwriting the risk.
6.   Profit margin.

**4.**   The petition stated:

For its tax year ending December 31, 1999, [Stewart Title] reported $3,336,214 in premiums per Schedule T for title insurance sold on risks located in Maine. It paid insurance premiums tax on $1,031,523 of this amount. The balance, $2,304,691, does not represent premiums and was never paid to [Stewart Title]. Rather, this amount represents title search and exami-

nation fees paid by the insureds to the local title agents upon which the agents pay a tax to Maine. The amount paid to [Stewart Title] was the balance of this Schedule T amount, or $1,031,523.

      . . . .

The balance of $2,304,691 was not paid to the insurer but, rather, was paid by the insureds to the title agents for their search and exam services. This is not an amount paid for insuring a risk or for "undertaking to indemnify the insured against a specified peril."

**5.**   The decision stated:

The Taxpayer's contract provides that the title company shall collect the amounts charged for the endorsements plus whatever amount the title company elects to

Director denied the petition, concluding that the total amount reported by Stewart Title on its Schedule T constituted the "premiums" paid by the insureds for title insurance.

[¶ 9] Stewart Title appealed the denial to the Superior Court pursuant to M.R. Civ. P. 80C and 36 M.R.S. § 151. In response to the parties' cross-motions for summary judgment, the Superior Court determined that the term "gross direct premiums" in 36 M.R.S. § 2513 means the amount of money that Stewart Title actually received from its agents—characterized as the "gross risk rate premiums" in Stewart Title's contract with its agents. In analyzing the record and the legal question presented, the court observed that it would be unfair to tax a title insurance company "for payments for other services such as title searches, escrow fees and closing costs, for which it receives no benefits, or payment."

[¶ 10] The court remanded the matter to the Assessor for a determination of a potential retaliatory tax pursuant to 36 M.R.S. § 2519 (2008). The Assessor, however, appealed to us, arguing that the court incorrectly interpreted "gross direct premiums" as provided in section 2513. We dismissed the appeal as interlocutory. *Stewart Title Guar. Co. v. State Tax Assessor*, 2006 ME 18, 892 A.2d 1162. On remand, the Assessor elected not to pursue Stewart Title's possible liability for an alternative retaliatory tax, and issued a reconsideration decision canceling his earlier assessment related to the retaliatory tax. The Superior Court issued an order stating its prior judgment was final, and this appeal followed.

[¶ 11] In a tax appeal pursuant to 36 M.R.S. § 151, we review the Superior Court's determinations of law de novo, and we review its findings of fact for clear error. *Flik Int'l Corp. v. State Tax Assessor*, 2002 ME 176, ¶ 8, 812 A.2d 974, 976–77. However, because the Superior Court decided this case on summary judgment, we review the entire judgment de novo, reviewing the evidence in the light most favorable to the party against whom judgment was entered. *Stanley v. Hancock County Comm'rs*, 2004 ME 157, ¶ 13, 864 A.2d 169, 174. The State's power to tax is construed in favor of the taxpayer. *Cmty. Telecomms. Corp. v. State Tax Assessor*, 684 A.2d 424, 426 (Me.1996).

## II.   LEGAL ANALYSIS

[¶ 12] The issue on appeal is whether the term "gross direct premiums" as used in 36 M.R.S. § 2513 is restricted to that portion of the consideration a title insurer receives from its agent after the agent deducts the portion of the consideration the agent retains for the title insurance and any title search and examination. Our analysis of this question requires that we first address (A) the summary judgment record that establishes the nature of the "charges made by non-direct agents" that Stewart claims as a deduction, and then turn to (B) the meaning of "gross direct premiums."

A. Summary Judgment Record Regarding Stewart Title's Deduction for "Charges Made by Non–Direct Agents"

[¶ 13] Stewart Title contends that the amounts it deducted for "charges made

---

charge for title work, but that the title company must remit a set portion of the charge for title work to the Taxpayer. . . . Thus, a portion of the title work charge is defined by contract by the Taxpayer to be "gross premiums." The title company retains the other portion of the title work charge. . . . You refer to this arrangement as a "split in the premium". . . .

by non-direct agents" included the charges imposed by its agents for escrow fees and closing costs in addition to fees for title examinations. However, neither Stewart Title's statement of undisputed material facts, nor the record references cited within it, make or support this assertion. This discrepancy is important because the composition of the "charges made by non-direct agents" claimed as a deduction by Stewart Title is central to determining whether all or a portion of those charges constitute premiums subject to taxation under section 2513.

[¶ 14] The summary judgment record establishes as undisputed fact that the deduction claimed for "charges made by non-direct agents" was taken only for title examination fees, and did not include escrow fees and closing costs. Stewart Title referred to and cited the Schedule T instructions in its statement of material facts, asserting that it "ha[d] relied upon the NAIC's instructions in preparing Schedule T's [sic] for use in the states in which it does business and is required to provide financial data concerning its operations." The Schedule T instructions indicate that the only specific closing charge or cost authorized to be included in the total premium reported is the "[c]ost of the title search/examination" and "that charges for escrow/settlement services provided are specifically excluded in the defined methods of reporting title premiums." Consistent with the Schedule T instructions, Stewart Title's summary judgment exhibits demonstrate that the deductions Stewart Title took in its Schedule T filings were for "title search and examination fees paid by the insureds to the local title agents." [6]

[¶ 15] The only fragment of the summary judgment record that possibly supports Stewart Title's assertions regarding the deductions for "charges made by non-direct agents" appears in its response to the Assessor's statement of undisputed material facts. The Assessor asserted that Stewart Title's deductions were for charges "for title search and exam retained by the non-direct agents." [7] Stew-

---

6. In a letter addressed to the Maine Revenue Services authored by Cynthia Popejoy, Stewart Title's Assistant Secretary and Treasurer, Popejoy explained that the deduction Stewart Title reported for "charges made by non-direct agents" was for "title search and exam retained by the agent." In a separate letter submitted in response to the Assessor's assessment of additional taxes, interest and penalties, Tannie Pizzitola, Stewart Title's Corporate Counsel, stated that the deduction Stewart Title had taken for "charges made by non-direct agents" in its Schedule T submissions was for "title search and examination fees paid by the insureds to the local title agents." Not surprisingly, there is no mention of escrow or closing fees in the Appellate Division's decision denying Stewart Title's reconsideration request.

7. Paragraph 11 of the Assessor's statement characterized the amounts reported by Stewart Title (referred to as "STG") in its Schedule T filings for the tax years in issue as follows:

11. On its Maine premium tax return, Form INS–4, for each of the years at issue, STG reduced the premiums reported on Schedule T to reflect "charges made by non-direct agents." Those amounts, according to STG, represented "charges … for title search and exam retained by the non-direct agents", which, STG concluded, should not be treated as taxable premium. The following table sets forth of [sic] results of STG's method of arriving at taxable premiums:

| Return Year | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| Premiums Reported on Sch.T | $3,336,214 | $3,250,402 | $4,002,942 | $5,705,509 |
| Less: Charges by non-direct agents | $2,304,691 | $2,255,028 | $2,845,917 | $4,184,630 |
| Taxable premiums per STG return | $1,031,523 | $ 995,374 | $1,157,025 | $1,520,879 |

art Title provided a qualified response, stating that "the amounts retained by [Stewart Title's] agents cover, in addition to title search and examination expenses, expenses relating to calling tax collectors, getting mortgage pay-off figures, coordinating with surveyors, preparing documents, handling closings, serving as an escrow and acting as the intermediary between the buyer and seller." Unfortunately, this statement is not supported by either of the record citations cited in Stewart Title's response.[8]

■ [¶ 16] A statement of material fact is deemed admitted unless it is properly controverted. *Stanley*, 2004 ME 157, ¶ 13, 864 A.2d at 174; M.R. Civ. P. 56(h)(4). In a tax appeal, the taxpayer carries the burden of proof on all issues. 36 M.R.S. § 151. Accordingly, the Asses-

sor's statement that Stewart Title's " 'charges made by non-direct agents'... [represent] 'charges ... for title search and exam retained by the non-direct agents', which, [Stewart Title] concluded, should not be treated as taxable premium" is deemed admitted. As such, it is an undisputed fact that the deductions at issue in this case are solely for amounts retained by Stewart Title's independent agents for title search and examination fees.

### B. The Meaning of "Gross Direct Premiums"

■ [¶ 17] The parties dispute the meaning of the term "gross direct premiums" as employed in 36 M.R.S. § 2513 for purposes of determining the two percent annual premium tax assessed against in-

---

8. Stewart Title responded to paragraph 11 of the Assessor's statement of undisputed material facts as follows:

11. Qualified. The amounts depicted in Paragraph 11 of the Respondent's *Statement of Undisputed Material Facts* as premiums reported on Schedule T, charges by non-direct agents, and taxable premiums for the years 1999, 2000, 2001 and 2002 are accurate. However, the amounts retained by STG's agents cover, in addition to title *search and examination expenses*, expenses relating to calling tax collectors, getting mortgage pay-off figures, coordinating with surveyors, preparing documents, handling closings, serving as an escrow and acting as the intermediary between the buyer and seller. (Exhibit 1 at ¶ 13 and Sub–Exhibits B, C, D & E thereof; Exhibit 2 at 29–30).

Neither of the record citations cited in Stewart Title's qualified response to paragraph 11 establishes that the amounts retained by non-direct agents, as reported on the Schedule T, included expenses relating to calling tax collectors, getting mortgage pay-off figures, coordinating with surveyors, preparing documents, handling closing, or serving as an escrow agent and intermediary. First, "Exhibit 1 at ¶ 13 and Sub–Exhibits B, C, D & E" refers to the Affidavit of Michael B. Skalka, Stewart Title's Executive Vice Presi-

dent and General Counsel. Paragraph 13 of the Skalka affidavit identifies Stewart Title's Maine Premium Tax Returns and supporting documents for 1999–2002 (exhibits B through E to the affidavit), and states that Stewart Title had thus filed "a written explanation of the basis for computing the premium tax, a retaliatory tax computation schedule, Schedule T, and its check in payment of the balance due for premium tax." The Skalka affidavit and the cited exhibits do not mention the non-title related expenses listed in Stewart Title's response to paragraph 11.

Second, "Exhibit 2 at 29–30" refers to the deposition of William P. Denley, president of STONNE. In the cited excerpt, Denley explains that title underwriting is only a small portion of what STONNE does, and that much of its work involves "preparing and gathering all the information that's necessary for a closing, calling tax collectors, getting mortgage payoffs, coordinating with surveyors, preparing documents, as well as the actual conduct of the closing, wherein our function is primarily that of an escrow agent." Neither the excerpt, nor the remainder of Denley's fifty-five-page deposition, state that Stewart Title included non-title services in the deductions it took in its Schedule T filings for charges made by non-direct agents.

surance companies. Section 2513 provides in relevant part that "[e]very insurance company ... engaged in the business of ... title insurance, shall ... pay a tax upon all gross direct premiums ... at the rate of 2% a year." [9] "Gross direct premiums" is not defined in the Maine Tax Code.[10]

[¶ 18] The Assessor contends that a "gross direct premium" is the total amount an insured pays as consideration for a title insurance policy, while Stewart Title contends that a "gross direct premium" is the total amount the insurer receives after its agent has deducted amounts associated with its title examination services.

■ [¶ 19] The meaning of the term "gross direct premiums" is not defined by statute, nor can its meaning be readily discerned from a textual analysis of section 2513. Consequently, both the Assessor and Stewart Title cite to extrinsic sources in support of their opposing positions. Because it is evident that the term "gross direct premiums" is not susceptible to a plain meaning analysis and is ambiguous, we, too, turn to extrinsic sources in our pursuit of the term's meaning, including: (1) the statutory definition of "premiums"; (2) the legislative history of section 2513; and (3) prior constructions of section 2513 by the Attorney General and by the Asses-

sor. We also address Stewart Title's contention that if we adopt the Assessor's position, Stewart Title will (4) be subjected to unlawful double taxation, and (5) section 2513 will be rendered unconstitutionally void for vagueness.

### 1. The Definition of "Premium"

[¶ 20] Stewart Title contends that section 2513 should be construed so as to be consistent with the definition of "premium" in Black's Law Dictionary. Black's defines "premium" as "[t]he sum paid or agreed to be paid by an insured to the underwriter (insurer) as the consideration for the insurance." Black's Law Dictionary 1063 (5th ed. 1979). Superimposing this definition on section 2513 would mean, consistent with Stewart Title's position, that an insurer should not be taxed for consideration retained by the insurer's agent, assuming the consideration is not passed through by the agent to the title insurer. The problem with this argument is that the word "premium" is defined in Maine law.

■ [¶ 21] Maine's Insurance Code defines "premium" broadly, so that all consideration, by whatever name, paid for insurance is part of a premium:

---

**9.** Title 36 M.R.S. § 2513 provides, in part:

Every insurance company or association that does business or collects premiums or assessments including annuity considerations in the State, including surety companies and companies engaged in the business of credit insurance or title insurance, shall, for the privilege of doing business in this State and in addition to any other taxes imposed for such privilege, pay a tax upon all gross direct premiums including annuity considerations, whether in cash or otherwise, on contracts written on risks located or resident in the State for insurance of life, annuity, fire, casualty and other risks at the rate of 2% a year.

**10.** Title 36 M.R.S. § 2515 (2008) works in tandem with section 2513. It provides:

In determining the amount of tax due under section 2513, each company shall deduct from the full amount of gross direct premiums the amount of all direct return premiums on the gross direct premiums and all dividends paid to policyholders on direct premiums, and the tax must be computed by those companies or their agents. Except when direct return premiums are returned in the same tax year that the premium was paid, the deduction allowed in this section may be taken only if the tax under this Part has been paid.

"Premium" is the consideration for insurance, by whatever name called. Any "assessment", or any "membership", "policy", "survey", "inspection", "service" or similar fee or other charge in consideration for an insurance contract is deemed part of the premium.

24-A M.R.S. § 2403 (2008). Thus, all of the consideration paid by an insured for insurance constitutes the premium, regardless of whether the consideration is paid by the insured to the insurer, its agent, or both. In addition, the consideration paid for insurance may include fees, including a fee for a service.

[¶ 22] It is undisputed that Stewart Title's contract with its agents provides that an agent "may charge any fees it desires of whatever character for its services which do not impose an obligation on [Stewart Title], including the search and examination of title (which are a necessary and integral part of underwriting) in transactions where title insurance is being issued." Thus, the contract itself recognizes that a title search and examination is an integral part of insurance underwriting. It follows from both the statutory definition of "premium" and the terms of Stewart Title's contract with its agent that a fee for a title examination may be an integral part of the consideration for title insurance.

## 2. Legislative History

[¶ 23] The Assessor and Stewart Title both cite to section 2513's legislative history in support of their opposing positions. When interpreting a statutory term that is not susceptible to a plain meaning analysis, we consider legislative history. *City of Bangor v. Penobscot County*, 2005 ME 35, ¶ 9, 868 A.2d 177, 180. The tax statute at issue in this case has a considerable, but not entirely illuminating, history.

[¶ 24] The Legislature first enacted a law requiring insurance companies to pay a tax on premiums in 1874. The law imposed a tax on "all premiums received":

Every insurance company or association which is or may be admitted to do business in this state, not incorporated or associated under the laws thereof, shall, as hereinafter provided, annually pay a tax upon *all premiums received,* whether in cash or in notes absolutely payable, in excess over losses actually paid during the year, on contracts made in this state, for the insurance of life, property or interests therein, at the rate of two per cent. per annum.

P.L. 1874, ch. 251, § 1 (emphasis added). The law further provided that the insurer could make certain specific deductions from the premiums it had received—for example, for losses during the year, or sums repaid or allowed for return premiums on cancelled policies—so that the tax was based "on the net amount thus actually received by said companies or their agents." P.L. 1874, ch. 251, § 2. Thus, under this earlier version of section 2513, Stewart Title's deduction for the amounts retained by its agents would not be permitted.

[¶ 25] Until 1939, the language requiring insurance companies to "pay a tax upon all premiums received" remained unchanged. In that year, the Legislature amended sections 52 and 53 of the statute. *See* P.L. 1939, ch. 1, §§ 3–4. The amendment added the language indicated below in bold type:

Sec. 52.... Every insurance company or association which does business or collects premiums or assessments in the state ... shall, **for the privilege of doing business in this state, and in addition to any other taxes imposed for such privilege,** as hereinafter provided, annually pay a tax upon all **gross direct**

premiums whether in cash **or otherwise,** on contracts **written on risks located or resident** in the state . . . at the rate of **2%** a year.

. . . .

Sec. 53. . . . In determining the amount of tax due under the preceding section, there shall be deducted by each company from the full amount of **gross direct** premiums, the amount of all **direct** return premiums **thereon, and all dividends paid to policyholders on direct premiums,** and the tax shall be computed by said companies or their agents as aforesaid.

P.L. 1939, ch. 1, §§ 3–4 (emphasis added). In the preamble to the chapter, the Legislature stated: "Whereas, the following changes in the laws relating to taxation of insurance companies are necessary because of certain court decisions and other conditions which make the present tax statutes unjust and inequitable." P.L. 1939, ch. 1, Emergency preamble. On the House floor, Representative Young, whose committee reported the bill, argued for its passage citing, in particular, "a technical procedure brought in the Supreme Court of the United States, commonly known to us attorneys as the Johnson case." [11] Legis. Rec. 171–72 (1939).

[¶ 26] The "Johnson case" cited by Representative Young is *Connecticut General Life Insurance Co. v. Johnson,* 303 U.S. 77, 58 S.Ct. 436, 82 L.Ed. 673 (1938). In *Johnson,* a Connecticut reinsurance company challenged, as a violation of due process, California's tax on premiums collected by the Connecticut reinsurer, where the only connection between California and the premiums was that the underlying insurance policies for which the reinsurance was purchased were issued in California. *See id.* at 81, 58 S.Ct. 436. The reinsurance involved no direct relationship between the Connecticut reinsurer and the party or parties originally insured in California. *Id.* The Court concluded as follows:

> Even though a tax on the privilege of doing business within the state in insuring residents and risks within it may be measured by the premiums collected, . . . and though the writing of policies without the state insuring residents and risks within it is taxable because within

**11.** The relevant portion of Representative Young's statement is as follows:

> These bills are very technical, because they involve points of law, but I will try to simplify them in such a way that the members can grasp the reasons for their introduction.
>
> For many years in the State of Maine foreign insurance companies have been selling insurance to our citizens. They set up in their financial structure a charge against every policy purchaser to whom they sell a policy in the State of Maine. Now that policy charge for the purposes of taxation in other states where they have to pay this tax varies from 2 per cent to 2 1–2 per cent. For many years our State has been negligent in not taxing these companies for the very money which they charge our policyholders. Through a technical procedure brought in the Supreme Court of the United States, commonly known to us attorneys as the Johnson case, some of our laws were attacked, therefore we lost advantages we previously held.
>
> This matter has been gone into to a great extent before the Insurance Committee, and the companies have appeared with their agents and counsel and so forth. By consultation with them and otherwise we finally arrived at this bill. There is no organized opposition to its passage. . . . We feel that 2 per cent on foreign companies, while it is not the maximum set in other states, would bring into the general fund of this State approximately $70,000.
>
> Now this money, the members understand, has already been collected in the form of a 2 per cent tax on the premium when they sell you and [me] a policy. We are not taking any money from the companies which they have not taken from the citizens of our State.

Legis. Rec. 171–72 (1939).

the granted privilege, there is no basis for saying that reinsurance *which does not run to the original insured,* and which from its inception to its termination involves no action taken within California, . . . is embraced in any privilege granted by that state.

*Id.* at 82, 58 S.Ct. 436 (citations omitted) (emphasis added).

[¶ 27] *Johnson* thus established that insurance premiums are taxable by a state only when the premiums paid to the insurer bear a direct relationship to risks located in or resident to the taxing state, and not when they bear only an indirect relationship. Accordingly, the Legislature, in enacting section 2513, sought to ensure that Maine's franchise tax statute regarding insurance companies complied with the requirements of due process as articulated in *Johnson.* This included a clarification that the premium tax applies only to those premiums for risks that are located or resident in Maine. There is no indication from this history that the word "direct" was intended to describe the manner in which the insurer or its agent receives or accounts for the payments made by the insured. Rather, it may be inferred that the word "direct" describes the relationship between the premium and the risk insured, indicating that there must be a direct relationship, not an indirect relationship as was present in the reinsurance context considered in *Johnson.*

[¶ 28] Furthermore, Representative Young's statement also indicated that the amendment was intended to ensure that Maine would tax, to the greatest extent permitted by and consistent with *Johnson,* premiums charged by insurance companies to Maine residents. Accordingly, treating the word "direct" in the term "gross direct premiums" as a word of limitation on the scope of the premium to be taxed, as argued by Stewart Title, is contrary to the purpose of the revisions made to section 2513 in 1939: to apply the tax as expansively as the Constitution permits.

[¶ 29] In support of its position, Stewart Title cites a concluding paragraph of Representative Young's comments, emphasizing the final element of that paragraph:

> [T]his money . . . has already been collected in the form of a 2 per cent tax on the premium when they sell you and [me] a policy. We are not taking any money from the companies which *they have not taken from the citizens of our State.*

Legis. Rec. 172 (1939) (emphasis added). Based on this, Stewart Title asserts that it "asks for no more than this—that it be taxed only on premiums *it* has *taken* from its Maine insureds." (Emphasis in original.)

[¶ 30] Stewart Title's reliance on this excerpt from the floor debate is unavailing for two reasons. First, the notion that the tax applies only to the extent the premium is received by the underwriting insurer runs counter to the definition of "premium" in section 2403, which focuses on the consideration for the insurance without regard to whether the consideration is received by the insurer, its agent, or both. Second, the floor debate and Representative Young's comments were not directed at, and therefore offer little insight regarding, the question presented here: Whether an insurer may be taxed not only on the money *it takes* from Maine's citizens, but also the money that *its agent takes* from Maine's citizens.

### 3. Prior Constructions of Section 2513

[¶ 31] Stewart Title also cites in support of its interpretation of section 2513:(a) a 1966 opinion of the Maine Attorney General, as well as (b) the Assessor's acceptance of Stewart Title's financial statements for 1987 through 2002, which listed as its taxable premiums only those funds remitted to it by its agents, thus allowing

it to only pay taxes on the funds it had received from its agents.[12]

### a. Advisory Opinion of the Maine Attorney General

[¶ 32] In a 1966 Advisory Opinion, the Maine Attorney General noted that "[s]ince the phrase 'gross direct premium' generally has no particular meaning in the field of insurance law it is safe to assume from the use of the language that the Legislature intended to tax the gross receipts from premiums directly attributable to business done in Maine paid by the insured to the insurer," and that the accepted meaning of the word "premium" is "the amount *paid to the company* as consideration for insurance." Op. Me. Att'y Gen. (1966), *reprinted in* 1965–1966 Me. Att'y Gen. Ann. Rep. 38–39 (emphasis in original). Stewart Title claims that these excerpts demonstrate that an essential element is that it is "money ... actually paid to an insurer by an insured in exchange for a promise of insurance," and that, "[i]n this case, Stewart is simply asking that a 'premium' be defined no differently."

[¶ 33] The 1966 Advisory Opinion addressed John Hancock Mutual Life Insurance Company's premium tax liability for its employees' group health insurance plan. Pursuant to the plan, the employees paid a portion of the cost of their insurance, and John Hancock paid a portion. The Attorney General opined that only the portion paid by the employees was taxable as a gross direct premium because "the Legislature intended to tax the gross receipts from premiums directly attributable to business done in Maine paid by the insured to the insurer." Op. Me. Att'y Gen. (1966), *reprinted in* 1965–1966 Me. Att'y Gen. Ann. Rep. 38. The Advisory Opinion did not address the question of how to treat premium payments received by an insurer's agent and then disbursed, in part, to the insurer. Rather, it addressed whether an employer's contributions to a group insurance plan are a taxable premium. We are not persuaded that the Advisory Opinion supports Stewart Title's position.

### b. Assessor's Long–Standing Acceptance of Stewart Title's Position

[¶ 34] For fifteen years, the Assessor accepted Stewart Title's tax returns

---

12. In addition, both parties cite to and discuss several decisions from other jurisdictions that have construed premium tax statutes in connection with the taxation of title insurance premiums. Two of the decisions address statutory schemes that are distinguishable from section 2513. *See First Am. Title Ins. Co. v. Dep't of Revenue*, 144 Wash.2d 300, 27 P.3d 604 (2001); *Lawyers Title Ins. Corp. v. Bd. of Ins. Comm'rs*, 207 S.W.2d 972 (Tex.Civ.App. 1948). *See also Stewart Title Guar. Co. v. Comm'r of Revenue*, No. A08–429, 757 N.W.2d 874, 2008 Minn. Lexis 627 (Minn. Dec. 4, 2008) (concluding that the term "gross premium" included the entire premium paid to the insurer or its agents where statute specifically excluded title search and examination fees from the definition of "gross premium"). The third decision, *Inter–County Title Guar. & Mortgage Co. v. State Tax Comm'n*, 28 N.Y.2d 179, 320 N.Y.S.2d 924, 269 N.E.2d 585 (1971), addresses a statute similar to section 2513, and the court's analysis supports the Assessor's position. In *Inter–County Title*, the New York Court of Appeals construed a franchise tax on "gross direct premiums" as including "both the 'cost' of title examination and the 'premiums'" for the title insurance itself. *Id.* at 587. First, the court looked to the statutory definition of "premium," and noted that the term encompassed "every kind of compensation received as consideration for insurance contracts." *Id.* The court then looked to the statutory definition of "title insurance," and noted that it "necessarily includes title examinations." *Id.* Reading the statutes together, the court concluded that the statutory scheme required a title insurer to pay a "franchise tax based upon the entire cost of the policy, both the 'risk' and the 'title examination' portions of the premium." *Id.*

without challenge. Citing this fact, Stewart Title urges us to abide by the principle that the Assessor's long-standing interpretation of a statute "should have weight, and perhaps great weight as a guide to judicial interpretation of a statute." *A.H. Benoit & Co. v. Johnson*, 160 Me. 201, 209, 202 A.2d 1, 5 (1964) (quoting *State v. York Utils. Co.*, 142 Me. 40, 44, 45 A.2d 634, 635–36 (1946)).

■ [¶ 35] As a general proposition, the Assessor is not estopped from enforcing a tax law because of a prior failure to enforce the law. *See Cmty. Telecomms.*, 684 A.2d at 427. Here, the Assessor's failure to audit or challenge Stewart Title's returns for the tax years that preceded 1999 does not preclude the Assessor from seeking to enforce the law for tax years 1999 through 2002. Moreover, there is no indication in the summary judgment record that the Assessor's failure to question Stewart Title's tax returns prior to 2003 was the product of a long-standing interpretation of section 2513, as opposed to a failure to more carefully examine Stewart Title's tax filings. In fact, the summary judgment record suggests the latter possibility.

[¶ 36] The Assessor asserted in paragraph 12 of its statement of undisputed material facts that Stewart Title was the only title insurance company doing business in Maine during 1999 to 2002 that reduced the amount of the premiums subject to Maine's two percent tax by the charges for title search and examination fees retained by its agents. The Assessor noted in this regard that "a substantial majority (75% or more)" of all title insurers' business during this period was through affiliated and non-affiliated title agents. Stewart Title provided a qualified response, but did not dispute the assertion that during the four-year period in issue, every other title insurer subject to the Maine tax treated title search and examination fees retained by agents as part of the premiums subject to the two percent tax. With this history, we see no basis to infer that every title insurer who paid premium taxes in Maine from 1999 to 2002, other than Stewart Title, did so in a manner that was contrary to a long-standing interpretation of section 2513 by the Assessor that, if followed, would have permitted them to reduce their tax payments.

4. Double Taxation

■ [¶ 37] Stewart Title argues as an alternative basis for adopting its construction of "gross direct premiums" that a contrary construction will result in exposing it to double taxation because it will be assessed a premium tax on amounts that have already been assessed to its agents as taxable ordinary income. Stewart Title contends that this is equivalent to imposing two taxes on the same taxable subject.

[¶ 38] Contrary to Stewart Title's argument, the statute does not expose it to double taxation. Here, Stewart Title and its agents each pay a different tax pursuant to two different statutes. Stewart Title is subject only to the premium tax pursuant to section 2513. 36 M.R.S. § 2513; 24–A M.R.S. § 605(1) (2008). Unlike its agents, Stewart Title is not subject to the Maine income tax. Stewart Title's agents only pay income tax on their receipts and are not subject to the premium tax for which Stewart Title is liable. As the Assessor argues, the fact that the premium tax on Stewart Title applies to amounts collected on its behalf by its agents does not transform the premium tax into a double tax.

5. Void for Vagueness

■ [¶ 39] Stewart Title argues, alternatively, that section 2513 is void for vagueness because there is no basis on

which a person of general intelligence could determine the meaning of "gross direct premium." Stewart Title contends that because "gross direct premium" is not defined, and because the Assessor's definition goes "far beyond" the common usage found in other jurisdictions, prospective taxpayers must rely on "sheer guesswork" to determine its meaning.

[¶ 40] A party claiming a statute is void for vagueness must demonstrate that the statute has no valid application or logical construction. *Town of Baldwin v. Carter*, 2002 ME 52, ¶¶ 8–9, 794 A.2d 62, 66–67. Generally, a statute is void if it forces a person of general intelligence to guess at its meaning. *City of Portland v. Jacobsky*, 496 A.2d 646, 649 (Me.1985). The party challenging the validity of the statute has the burden of proving its invalidity. *Carter*, 2002 ME 52, ¶ 9, 794 A.2d at 66.

[¶ 41] Stewart Title has failed to show that section 2513 is void for vagueness. Although the term "gross direct premium" may be susceptible to different meanings, we have concluded that, when construed in light of its context and purpose, the term is reasonably susceptible to only one meaning.

### 6. Conclusion

[¶ 42] The construction of an ambiguous statute has been aptly described as a "holistic endeavor," *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60, 125 S.Ct. 460, 160 L.Ed.2d 389 (2004), requiring that ambiguous terms be construed in light of the statute's context and purpose. Here, the statute's context is established by the expansive definition of "premium" in the Insurance Code that centers on the *consideration paid* for the insurance, "by whatever name called," 24–A M.R.S. § 2403, including consideration in the form of payments for surveys, services, or fees.

The definition of "premium" does not turn on the identity of the recipients of the consideration. The statute's purpose is largely established by the legislative history of section 2513, which indicates that the term was enacted into law in 1939 in response to the Supreme Court's 1938 decision in *Johnson* that precluded states from taxing insurance premiums that insure against risks that have, at most, an indirect connection to the jurisdiction in which the tax is imposed. When, as in the case of section 2513, the Legislature enacts into law a new statutory term in direct response to a Supreme Court decision, the term's purpose is readily discerned. *See* Philip Talmadge, *A New Approach to Statutory Interpretation in Washington*, 25 Seattle U.L. Rev. 179, 189 (2001).

[¶ 43] Here, the context and purpose of "gross direct premiums," as used in 36 M.R.S. § 2513, lead us to conclude that the term means insurance premiums that are directly attributable to risks located or resident in Maine, and to exclude from taxation premiums that are indirectly associated with such risks; that the taxable premium includes the total consideration paid by the insured for the title insurance, including the cost of the title search and examination completed by the insurer or its agent; and that because the tax is a tax on premiums and not receipts, the tax applies regardless of whether all or a portion of the premium is paid to an agent for the insurer in the first instance, or directly to the insurer.

The entry is:

Judgment vacated. Remanded for further proceedings in accordance with this opinion.