MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2018 ME 113
Docket:      Cum-17-297
Argued:      May 15, 2018
Decided:     August 9, 2018
Revised:     October 11, 2018

Panel:       ALEXANDER, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

## STATE OF MAINE

v.

## GREGORY NISBET

JABAR, J.

[¶1]  Gregory Nisbet appeals from a judgment of conviction for violating a public safety fire rule (Class E), 25 M.R.S. § 2452(3) (2017), entered by the Unified Criminal Docket (Cumberland County, *Warren, J.*) after a bench trial. Nisbet was convicted of failing to comply with section 24.2.2.3.3 of the 2009 edition of the National Fire Protection Association (NFPA) 101: Life Safety Code, as incorporated by rule by the Commissioner of the Department of Public Safety.[1]  *See* 25 M.R.S. § 2452(3); 9 C.M.R. 16 219 020-1 § 1 (2011); NFPA 101:

---

[1]  "The Life Safety Code is a model code established by the National Fire Protection Association." *Estate of Smith v. Salvesen*, 2016 ME 100, ¶ 7 n.2, 143 A.3d 780.  The Commissioner of the Department of Public Safety promulgated rules incorporating the 2009 edition of the National Fire Protection Association (NFPA) 101: Life Safety Code, by reference, with certain modifications not applicable here.  *See* 25 M.R.S. § 2452(3) (2017); 9 C.M.R. 16 219 020-1 § 1 (2011); NFPA 101: Life Safety Code (Nat'l Fire Prot. Ass'n 2009 ed.) (hereinafter "Life Safety Code").  Thus, the public fire safety rules

Life Safety Code § 24.2.2.3.3 (Nat'l Fire Prot. Ass'n 2009 ed.) (hereinafter "Life Safety Code"). On appeal, Nisbet makes the following arguments: that (1) section 24.2.2.3.3 of the Life Safety Code is void for vagueness pursuant to the due process clauses of the United States and Maine Constitutions; (2) the court abused its discretion in determining that the State's failure to provide him with a policy statement regarding the enforcement of section 24.2.2.3.3 did not constitute a violation pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963); and (3) the evidence presented at trial was insufficient to sustain a conviction for failure to comply with section 24.2.2.3.3. We affirm the judgment.

## I. BACKGROUND

A. Factual History

[¶2] "Viewing the evidence in the light most favorable to the State, the trial record supports the following facts," which the court found after a five-day trial. *State v. Jeskey*, 2016 ME 134, ¶ 2, 146 A.3d 127. Nisbet was the owner of an apartment building located on 20 Noyes Street in Portland. In that capacity, he collected rent from the building's occupants and exercised management responsibility over the property. On November 1, 2014, a fire occurred at 20

Nisbet was charged with violating were specific provisions of the Life Safety Code, incorporated into the Code of Maine Rules by reference, and this opinion will reference those provisions directly.

3

Noyes Street, resulting in the death of six people. The fire began on the porch outside the front door and proceeded up the stairway that served as the primary means of escape for those on the second and third floors. On that particular day, the entrance to the back stairway on the second floor was blocked by furniture because a tenant had recently moved in.

[¶3] Three of the building's occupants survived the fire by exiting the building through a window onto the back porch within ninety seconds after two of them woke up. One of those survivors testified that before he escaped, the front door was fully engulfed in flames, thick smoke was billowing from the door and rising up the stairway, and he was having difficulty breathing. As the survivors escaped, the front door opened and the fire proceeded up the stairway very quickly, bringing intense heat with it. Smoke and accompanying gases, including carbon monoxide, preceded the heat and rose up the stairways to the third floor before spreading throughout the first and second floors. According to expert testimony, a person could become unconscious in as little as thirty seconds after breathing a significant amount of carbon monoxide-laden smoke.

[¶4] Each victim except for one died from smoke inhalation. The third-floor bedroom windows were considerably smaller than required by the

Life Safety Code and too small to use as a secondary means of escape. They were double hung, and one witness testified that they could only be opened as little as eight inches. There was also testimony that a person could remove the entire window frame by removing certain clips—if the person knew how to do that. Long before the fire, a contractor working for Nisbet told him that the third-floor windows were not large enough to be a legal secondary means of escape, and Nisbet brushed off those comments.

B.    Preliminary Proceedings

[¶5]  On July 10, 2015, Nisbet was charged by indictment with six counts of manslaughter (Class A), 17-A M.R.S. 203(1)(A) (2017), and four counts of violating public fire safety rules (Class E), 25 M.R.S. § 2452(3), namely, provisions of the Life Safety Code. On September 31, 2016, after Nisbet waived his right to a jury trial pursuant to M.R.U. Crim. P. 23(a), the State charged an eleventh count by information, alleging violation of the Life Safety Code provision that is the subject of this appeal, section 24.2.2.3.3. *See* 25 M.R.S. § 2452(3); 9 C.M.R. 16 219 020-1 § 1. That provision requires that every sleeping area in one- and two-family dwellings have windows available as a secondary means of escape, that the windows be operable from the inside without "special effort," and that the windows have a "clear opening" of 5.7 square feet, a

5

minimum width of twenty inches, and a minimum height of twenty-four inches. Life Safety Code § 24.2.2.3.3.

C.     Trial and Sentencing

[¶6]  The parties proceeded to a bench trial on October 3, 2016, and evidence was presented over five days.  On October 21, 2016, the court found Nisbet not guilty on the six counts of manslaughter and the four counts of violation of the Life Safety Code originally charged, and guilty on the later-charged violation of section 24.2.2.3.3.  On December 1, 2016, the court sentenced Nisbet to ninety days' imprisonment and a $1,000 fine.

D.     Motion for a New Trial

[¶7]  On December 19, 2016, Nisbet filed a motion for a new trial pursuant to M.R.U. Crim. P. 33.  In that motion, Nisbet alleged that the State had failed to provide him with a policy memorandum that the State Fire Marshal issued in October 2013 (2013 Memorandum).[2]  That document, which indicates that it is in reference to a "[p]olicy for clarification of existing egress windows," states in pertinent part:

---

[2]  Pursuant to section 4.6.5 of the Life Safety Code, "Where it is evident that a reasonable degree of safety is provided, the requirements for existing buildings shall be permitted to be modified if their application would be impractical in the judgment of the authority having jurisdiction."  The 2013 Memorandum appears to have been issued pursuant to section 4.6.5.

> Any building constructed before 1976 will be allowed to meet the following specifications. The net clear opening would be allowed to meet the minimum 20" in width and 24" in height with a total net clear opening of 3.3 sq. ft.; if the window is constructed of wood or vinyl and the overall window sash size meets a minimum of 5.0 sq. ft.

The "special effort" provision from section 24.2.2.3.3 remained the same.

[¶8] According to Nisbet, because the size of his third-floor windows met the minimum dimensions set forth in the memorandum—and there was no dispute that his apartment building was built before 1976—the State's failure to provide the memorandum constituted a failure to disclose exculpatory evidence pursuant to *Brady*, 373 U.S. at 87 ("We now hold that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). Nisbet argued that he could not have discovered the memorandum before trial through the exercise of due diligence, and if the memorandum had been provided to him, "it probably would have changed the verdict in this case."

[¶9] A hearing on the motion for a new trial was held on February 23, 2017, during which the court heard testimony from both parties regarding the State's nondisclosure of the 2013 Memorandum. The court then denied Nisbet's motion in an order dated June 15, 2017, in which it made the

following findings of fact, which are supported by competent evidence in the motion record. *See State v. Twardus*, 2013 ME 74, ¶ 29, 72 A.3d 523 ("When reviewing the denial of a motion for a new trial pursuant to M.R. Crim. P. 33 on the basis of newly discovered evidence, we review the court's findings of fact for clear error . . . .").[3]

[¶10] Neither of the Assistant Attorneys General (AAG) prosecuting the case was aware of the 2013 Memorandum until an assistant fire marshal mentioned it to one of the AAGs on the evening of October 4, 2016—after the second day of trial. The AAG told the assistant fire marshal to bring the memorandum to court the next morning, but after receiving it on October 5, the AAG read it quickly and did not correctly understand its contents. At the time, he was primarily focused on drafting a stipulation with defense counsel. When he and defense counsel first spoke via telephone on October 5, the AAG told defense counsel that they needed to discuss the stipulation and mentioned that he had a document to provide. The AAG and defense counsel subsequently met to work on revisions to the stipulation, and although the AAG had no specific

---

[3] Although, unlike *Twardus*, this case involves the denial of a M.R.U. Crim. P. 33 motion for a new trial based on alleged violations pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and not newly discovered evidence, we nonetheless apply the same standard of review. *See State v. Twardus*, 2013 ME 74, ¶ 29, 72 A.3d 523.

recollection of giving defense counsel a copy of the 2013 Memorandum, it was evident from his testimony that he believed he did. Thus, although the AAG intended to provide the defense with the 2013 Memorandum, he failed to do so. For her part, defense counsel did not recall receiving the 2013 Memorandum.

[¶11] The court found that each of the third-floor windows was double-hung, with a bottom sash covering two-thirds of the window height and a top sash covering one-third of the window height. As a result, the windows could only be opened to a height that was one-third of the total window height. The court also recognized that the only window measurements offered at trial indicated that the window frames measured 34 inches high and 21.5 inches wide, but that it had previously declined to rely on those measurements because—contrary to all photographic evidence—those measurements would make the third-floor window openings taller than the second-floor window openings, which the court found not to be the case.

[¶12] Even assuming that those measurements were reliable, however, the court again noted that the window could then only be opened to a height of approximately 11.3 inches. Assuming also that the windows were 21.5 inches wide, the clear opening they provided would have been 1.7 square feet—only half of the clear opening required by the 2013 Memorandum. This

9

determination was consistent with witnesses' testimony that the windows only opened "eight inches," "six inches," "not very far . . . maybe about a foot," and "less than twelve inches."

[¶13] Applying the test articulated by the Supreme Court in *Brady*, 373 U.S. at 87, the court reached several conclusions of law based on these findings. First, the court reasoned that the 2013 Memorandum qualified as exculpatory evidence, and that it was in the possession of the prosecution. Second, the court determined that although the 2013 Memorandum was not in the exclusive possession of the Fire Marshal's Office—it had apparently been made available to defense counsel by someone in the real estate industry— there was "no evidence that the policy statement itself . . . had been widely publicized, was readily available from public sources, or would likely have been obtained by defense counsel through the exercise of reasonable diligence in preparing for trial." As such, the court concluded that the memorandum's nondisclosure was not excused by the possibility that it could have come to defense counsel's attention through another source before trial. Finally, the court determined that the 2013 Memorandum was not "material" for purposes of the *Brady* analysis because "all of the evidence offered at the trial demonstrated beyond a reasonable doubt that . . . the third floor windows did

not comply with the Fire Code even applying [the more lenient requirement contained in the 2013 Memorandum]."

[¶14]  As such, the court denied Nisbet's motion for a new trial.  This appeal followed.  *See* 15 M.R.S. § 2115 (2017); M.R. App. P. 2(b)(2)(A) (Tower 2016).[4]

## II.  DISCUSSION

A.  Life Safety Code Constitutionality

[¶15]  Nisbet contends that Life Safety Code § 24.2.2.3.3 "is simply too vague to comport with due process requirements," such that "[n]o ordinary person could reasonably be held to answer to its standard."  Nisbet specifically takes issue with the section's use of the terms "special effort" and "clear opening," which he argues are void for vagueness.  Life Safety Code § 24.2.2.3.3. He also argues that 25 M.R.S. § 2452(3) and section 24.2.2.3.3 violate his rights pursuant to the due process clause of the Maine and United States Constitutions because he lacked notice of them.

[¶16]  We normally review the constitutionality of a Maine statute de novo.  *See State v. McLaughlin*, 2002 ME 55, ¶ 5, 794 A.2d 69.  However,

---

[4]  The restyled Maine Rules of Appellate Procedure do not apply because this appeal was filed before September 1, 2017.  *See* M.R. App. P. 1 (restyled Rules).

11

because Nisbet failed to raise this issue during the trial proceedings, we review for obvious error the trial court's failure to declare the statute unconstitutional.[5] M.R.U. Crim. P. 52(b); *see State v. Greenleaf*, 2004 ME 149, ¶ 34, 863 A.2d 877.

[¶17]    The due process clauses of the United States and Maine Constitutions "require that criminal defendants be given fair notice of the standard of conduct to which they can be held accountable." *State v. Witham*, 2005 ME 79, ¶ 7, 876 A.2d 40 (alteration omitted) (quotation marks omitted). Because a statute is presumed to be constitutional, *Union Mut. Life Ins. Co. v. Emerson*, 345 A.2d 504, 507 (Me. 1975), "[a] party claiming a statute is void for vagueness must demonstrate that the statute has no valid application or logical construction," *Stewart Title Guar. Co. v. State Tax Assessor*, 2009 ME 8, ¶ 40, 963 A.2d 169. In order to find a statute void for vagueness, "we must find that the statute fails to define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *State v.*

---

[5] "For an error or defect to be obvious for purposes of Rule 52(b), there must be (1) an error, (2) that is plain, and (3) that affects substantial rights. If these conditions are met, we will exercise our discretion to notice an unpreserved error only if we also conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings." *State v. Pabon*, 2011 ME 100, ¶ 29, 28 A.3d 1147.

*Falcone*, 2006 ME 90, ¶ 6, 902 A.2d 141 (quotation marks omitted). "Such an unacceptable statute would often be 'so vague and indefinite as really to be no rule or standard at all.'" *Shapiro Bros. Shoe Co. v. Lewiston-Auburn Shoeworkers Protective Ass'n*, 320 A.2d 247, 253 (Me. 1974) (quoting *A. B. Small Co. v. Am. Sugar Ref. Co.*, 267 U.S. 233, 239 (1925)).

[¶18]  However, "[i]n examining the sufficiency of statutory language, [o]bjective quantification, mathematical certainty, and absolute precision are not required."  *Witham*, 2005 ME 79, ¶ 7, 876 A.2d 40 (quotation marks omitted).  Indeed, a void-for-vagueness challenge will fail "[w]here the meaning of a term can be adequately determined by examining the plain language definition or the common law definition." *Falcone*, 2006 ME 90, ¶ 10, 902 A.2d 141.  "In a facial challenge to a statute on vagueness grounds, we need not examine the facial validity of the statute and test its constitutionality in all conceivable factual contexts."  *State v. Aboda*, 2010 ME 125, ¶ 15, 8 A.3d 719 (quotation marks omitted).  Rather, "[w]e address a void for vagueness challenge by testing it in the circumstances of the individual case."  *State v. Thongsavanh*, 2007 ME 20, ¶ 36, 915 A.2d 421.

1.     The Regulatory Language

13

[¶19]  The rule Nisbet allegedly violated, Life Safety Code § 24.2.2.3.3, provides in relevant part that a secondary means of escape

> shall be an outside window or door operable from the inside without the use of tools, keys, or special effort and shall provide a clear opening of not less than 5.7 ft$^2$ (0.53 m$^2$).  The width shall be not less than 20 in. (510 mm), and the height shall be not less than 24 in. (610 mm).

[¶20]  Although the Life Safety Code does not define the terms "clear opening" or "special effort," it provides that "[w]here terms are not defined . . . they shall be defined using their ordinarily accepted meanings within the context in which they are used."  Life Safety Code § 3.1.  The Code further specifies "*Webster's Third New International Dictionary of the English Language, Unabridged*," as a source for ordinarily accepted meanings. *Id.*  We address each term in turn.

a.  "Clear Opening"

[¶21]  *Webster's Third New International Dictionary* defines "clear" as "free from obstruction, burden, limitation, defect, or other restricting features," and defines "opening" as "something that is open."  *Webster's Third New International Dictionary of the English Language Unabridged* (*Webster's*) 419, 1580 (2002).  That dictionary defines "open" as "fit to be traveled over or through: presenting no serious obstacle to passage or view."  *Id.* at 1579.

Accordingly, the ordinarily accepted meaning of the term "clear opening"—in the context of section 24.2.2.3.3—plainly requires that a door or window serving as a secondary means of escape must provide an obstruction-free space that is fit to be traveled through. *See Falcone*, 2006 ME 90, ¶ 10, 902 A.2d 141.

[¶22]  Even if this plain language were not so clear, however, Nisbet's void-for-vagueness argument is foreclosed by the fact that the term "clear opening" is modified by precise measurements requiring that the space be at least 20 inches (510 mm) wide and 24 inches (610 mm) tall, and a minimum of 5.7 square feet (0.53 m²) in size.  Life Safety Code § 24.2.2.3.3.  This standard can hardly be deemed to be so vague or indefinite "as really to be no rule or standard at all."  *Shapiro Bros. Shoe Co.*, 320 A.2d at 253 (quotation marks omitted).

        b.    "Special Effort"

[¶23]  *Webster's Third New International Dictionary* defines "effort" as "conscious exertion of physical or mental power," and defines "special" as "one outside of or in addition to the regular or normal number, quantity, series, range, or similar category."  *Webster's* at 725, 2186.  As such, the plain language of the term "special effort"—in the context of section 24.2.2.3.3—requires that an occupant be able to operate a door or window serving as a secondary means

of escape without using an amount of physical exertion greater than normally required.  Although lacking in "mathematical certainty [and] absolute precision," *Witham*, 2005 ME 79, ¶ 7, 876 A.2d 40 (quotation marks omitted), the term is sufficiently definite that ordinary people can understand its meaning, *see Falcone*, 2006 ME 90, ¶ 6, 902 A.2d 141.  As Nisbet contends, the standard established by this term may be difficult to apply in different scenarios.  However, the fact that "in some hypothetical instances [regulatory language] might require interpretation or present formidable factual issues of proof . . . does not mean that the judiciary cannot apply the law in accordance with the spirit of the legislative intent." *Shapiro Bros. Shoe Co.*, 320 A.2d at 253-54.

[¶24]  Finally—of equal applicability to the terms "clear opening" and "special effort"—we have previously held that, when determining whether a statute is void for vagueness, that statute may be construed "in light of its context and purpose." *Stewart Title Guar. Co.*, 2009 ME 8, ¶ 41, 963 A.2d 169.  Here, the Life Safety Code's stated purpose is "to provide minimum requirements, with due regard to function, for the design, operation, and maintenance of buildings and structures for safety to life from fire." Life Safety Code § 1.2.  In light of that purpose, the meanings of the terms at issue are

further clarified—given that the Code is intended to ensure "safety to life from fire," *id.*, it is reasonable to conclude that the regulation must be construed to afford building occupants an unobstructed, easy-to-open window or door in the event of a fire. Thus, construed both in isolation and "in light of its context and its purpose," *Stewart Title Guar. Co.*, 2009 ME 8, ¶ 41, 963 A.2d 169, the terms "clear opening" and "special effort" are sufficiently clear to put ordinary people on fair notice that they can be held accountable for failing to provide a secondary means of escape that is easy to operate and large enough to travel through.

2.    Lack of Notice

[¶25]  Nisbet additionally argues that both "the statutory scheme created by [25 M.R.S. § 2452(3)] and the Life Safety Code [are] fundamentally unfair" because he did not have notice of that scheme. This argument is unavailing, given that the Life Safety Code is not unconstitutionally vague and citizens "are generally required to know the law and cannot claim ignorance of the law as a defense." *Falcone*, 2006 ME 90, ¶ 23, 902 A.2d 141 (Dana, J., dissenting); *see also State v. Goodenow*, 65 Me. 30, 32-33 (1876) ("[The defendants] plead their ignorance of the law. This cannot excuse them. Ignorance of the law excuses no one."); *Jenks v. Mathews*, 31 Me. 318, 320 (1850) ("It is a well known maxim

that ignorance of law will not furnish an excuse for any person, either for a breach or an omission of duty." (quotation marks omitted)).

[¶26] Moreover, even if Nisbet were not specifically aware of the requirements set forth in section 24.2.2.3.3, he was at least generally aware of them because a contractor informed him that the windows were not large enough to serve as a legal secondary means of escape. *Cf. Nichols v. Marsden*, 483 A.2d 341, 343 (Me. 1984) (stating that although the common law rule provides that "a landlord is not liable to a tenant for personal injuries caused by a defective condition in premises under the tenant's exclusive control," an exception to this rule occurs where the landlord "fails to disclose the existence of a latent defect *which he knows or should have known existed*" (emphasis added)).

## B.    *Brady* Violation

[¶27] Nisbet next argues that the court abused its discretion in determining that the State's failure to provide him with a copy of the 2013 Memorandum was not material and therefore not a *Brady* violation. He contends that the 2013 Memorandum "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict" because, inter alia, both the court and the parties "prepared for the entire trial,

examined all the witnesses and evidence, deliberated and reached a verdict informed by the wrong legal standard."

[¶28]   The denial of a motion for a new trial based on an alleged *Brady* violation is reviewed for an abuse of discretion.[6]  *Twardus*, 2013 ME 74, ¶ 32, 72 A.3d 523 (citing *United States v. Connolly*, 504 F.3d 206, 211-12, 219 (1st Cir. 2007)).  "[A] trial court has exceeded the bounds of its discretion when, in discretionary decision-making, the court: (1) considers a factor prohibited by law; (2) declines to consider a legally proper factor under a mistaken belief that the factor cannot be considered; (3) acts or declines to act based on a mistaken view of the law; or (4) expressly or implicitly finds facts not supported by the record according to the clear error standard of review."  *Smith v. Rideout*, 2010 ME 69, ¶ 13, 1 A.3d 441 (citations omitted).

[¶29]   "A defendant's due process rights are violated when the prosecution withholds evidence favorable to him."  *State v. Jobin*, 510 A.2d 527, 529-30 (Me. 1986) (citing *Brady*, 373 U.S. at 87).  A *Brady* violation has three

---

[6] Although we generally review an alleged due process violation de novo, *State v. Williamson*, 2017 ME 108, ¶ 21, 163 A.3d 127, in the context of a denial of a M.R.U. Crim. P. 33 motion for a new trial based upon a *Brady* violation, "an appreciable measure of respect is due to the presider's sense of the ebb and flow of the recently concluded trial," *United States v. Connolly*, 504 F.3d 206, 211 (1st Cir. 2007) (quotation marks omitted).  However, that distinction is minimal here because "a [trial] court abuses its discretion whenever it predicates its ruling on an erroneous view of the law and abstract questions of law engender de novo review."  *Id.* at 211-12 (citation omitted).

elements: (1) the evidence must be favorable to the defendant because it was exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. *Twardus*, 2013 ME 74, ¶ 32, 72 A.3d 523 (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Evidence is prejudicial when it is "material"—that is, "the nondisclosure was so serious that there is a *reasonable probability* that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281 (emphasis added). A "reasonable probability" exists when "the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Smith v. Cain*, 565 U.S. 73, 75 (2012) (alteration omitted) (quotation marks omitted).

[¶30] Here, the State does not dispute that the 2013 Memorandum was favorable to Nisbet and that it was not disclosed to him.[7] Thus, the sole issue before us is whether the 2013 Memorandum was material to the determination of Nisbet's guilt.

---

[7] The State does cite to federal case law for the proposition that, pursuant to *Brady*, evidence is not deemed to be suppressed where it is available to the defense through another source in the exercise of due diligence. *See United States v. Shields*, 789 F.3d 733, 747 (7th Cir. 2015); *Matthews v. Ishee*, 486 F.3d 883, 891 (6th Cir. 2007). However, we decline to address the issue because the State acknowledges that the court determined the 2013 Memorandum had been suppressed and does not affirmatively argue that we should conclude otherwise.

[¶31] We conclude the trial court did not abuse its discretion in holding that, if the 2013 Memorandum had not been suppressed and Nisbet had planned his "defense strategy, cross examination, witness presentations, decisions about objections and stipulations, and arguments to the court" based on that memorandum, there is no possibility that he could have established that the window could have been opened to provide a clear opening of 3.3 square feet.[8] Each of the third-floor windows was double hung, with a bottom sash covering two-thirds of the window and a top sash covering one third of the window, thereby permitting the window to be opened only to one-third of its total height. Therefore, even crediting the accuracy of the measurements introduced at trial that the window frames were 34 inches tall and 21.5 inches wide—which the court did not, given that those measurements would, contrary to photographic evidence, make them larger than the second-floor windows— the window could only have been opened to a height of 11.3 inches, creating a clear opening of only 1.7 square feet.

[¶32] This conclusion is buttressed by the testimony of former third-floor inhabitants, all of whom stated that the windows opened only

---

[8] As the court noted in its order denying Nisbet's Rule 33 motion, "The trial testimony of defense witnesses . . . demonstrates that the defense was aware at the time of trial that the 5.7 square foot requirement did not necessarily apply. It did not pursue that issue."

between six to twelve inches. Even using the most generous of these recollections, the clear opening provided by the window would only then equal just over one square foot, less than half of the 3.3 square feet required pursuant to the 2013 Memorandum.[9] Accordingly, the 2013 Memorandum was not material within the meaning of *Brady* because there is no reasonable probability that the State's production of the 2013 Memorandum and its admission in evidence would have produced a different result for Nisbet in the sense that confidence in the outcome of his trial has been undermined.[10] *See Strickler*, 527 U.S. at 281; *Smith*, 565 U.S. at 75.

---

[9] At oral argument, Nisbet for the first time raised the alternative contention that if the 2013 Memorandum had been available to him, he would not have attempted to establish that the windows met the minimum size requirements and would instead have focused on demonstrating that the windows did not require "special effort" to operate. *See* Life Safety Code § 24.2.2.3.3. However, because Nisbet failed to advance this theory both in his motion for a new trial and in his briefs before us, we decline to consider it. *See Laqualia v. Laqualia*, 2011 ME 114, ¶ 16 n.6, 30 A.3d 838; *Teel v. Colson*, 396 A.2d 529, 534 (Me. 1979). Even if preserved, the issue would have been unavailing given the court's supported factual finding that removing the window altogether—which is how Nisbet argues the opening permitted by the 2013 Memorandum would have been satisfied— would require "special effort" because someone trying to escape could well be unaware that the window *could be* removed and, in any event, would not have time to remove the window in an emergency.

[10] Nisbet's more generalized argument, that the 2013 Memorandum was "material" because the parties and the court had failed to apply the correct legal standard, is therefore misplaced. As the case law makes clear, the Supreme Court's reasoning regarding "confidence in the outcome of the trial" is centered on the reasonable probability that a different outcome would have resulted with the inclusion of the suppressed evidence, and not on the nature of the proceedings that occurred— however erroneously—in the absence of that evidence. *United States v. Bagley*, 473 U.S. 667, 682-84 (1985); *see Smith v. Cain*, 565 U.S. 73, 75-77 (2012); *Strickler v. Greene*, 527 U.S. 263, 290-96 (1999); *Kyles v. Whitney*, 514 U.S. 419, 434-35, 441-54 (1995); *see also Twardus*, 2013 ME 74, ¶¶ 34-50, 72 A.3d 523; *State v. Silva*, 2012 ME 120, ¶ 10, 56 A.3d 1230; *State v. Harnish*, 560 A.2d 5, 7 (Me. 1989).

C.      Sufficiency of the Evidence

[¶33]  Finally, Nisbet argues that the evidence was insufficient to support his conviction for two reasons.  First, he contends that due to the existence of the 2013 Memorandum, the State was required to prove that 20 Noyes Street was constructed after 1976 in order for the court to apply the standard set forth in section 24.2.2.3.3.  Second, Nisbet argues that his contractor's testimony— that he informed Nisbet that the third-floor windows were not large enough to be a legal secondary means of escape—was insufficient to support the court's finding that he knowingly violated section 24.2.2.3.3.

[¶34]  "In assessing the sufficiency of evidence to support a criminal conviction, we review the evidence, and all reasonable inferences drawn from that evidence, in the light most favorable to the State to determine whether the trier of fact could have found every element of the offense charged beyond a reasonable doubt."  *State v. Tayman*, 2008 ME 177, ¶ 4, 960 A.2d 1151.  "In dwellings or dwelling units of two rooms or more," Life Safety Code § 24.2.2.1.1, it is a Class E crime pursuant to 25 M.R.S. § 2452(3) to fail to provide a secondary means of escape in compliance with the requirements of section

24.2.2.3.3. Although section 2542(3) does not specify a culpable state of mind, the court found that Nisbet's violation had been knowing.[11]

1.    The 2013 Memorandum

[¶35]  Nisbet contends that "the State did not meet its threshold burden of proving beyond a reasonable doubt that [section] 24.2.2.3.3 actually applied to the Appellant, as the building in question was constructed prior to 1976 and that section, unmodified, does apply to buildings constructed in that time period."  This argument is unpersuasive.  Although the court found Nisbet guilty after considering section 24.2.2.3.3—rather than the more lenient specifications required by the 2013 Memorandum—any error was harmless because, upon consideration of Nisbet's motion for a new trial, the court found that its determination of guilt would have remained the same even if it had applied the 2013 Memorandum's requirements.  *See* M.R.U. Crim. P. 52(a); *State v. Larsen*, 2013 ME 38, ¶ 23, 65 A.3d 1203.

2.    The Contractor's Testimony

---

[11]  In post-trial memoranda, the State argued that a culpable state of mind was not required for a violation pursuant to 25 M.R.S. § 2452(3) (2017), while Nisbet argued that "the appropriate mental state to use is either intentional, knowing or reckless."  Because neither party on appeal contends that the court erred in applying the culpable state of mind of "knowing," we assume, without deciding, that this is the mental state required by section 2453(3).

[¶36]   Finally, Nisbet argues that his contractor's testimony—that he informed Nisbet that the third-floor windows were legally too small—is insufficient to support a finding that Nisbet knowingly violated section 24.2.2.3.3.  "In a jury-waived trial, it is the duty of the fact-finder to reconcile conflicting testimony, to determine its relative weight, and to determine what part of the testimony is credible and worthy of belief." *State v. Cotton*, 673 A.2d 1317, 1321 (Me. 1996) (alteration omitted) (quotation marks omitted). Viewing the evidence in the light most favorable to the State, the court, as the fact-finder, could have attached sufficient weight to Nisbet's interaction with his contractor to find beyond a reasonable doubt that Nisbet was aware that the third-floor windows were impermissibly small.  *See id.*; *see also Tayman*, 2008 ME 177, ¶ 4, 960 A.2d 1151.

The entry is:

Judgment affirmed.

---

Luke S. Rioux, Esq. (orally), Rioux, Donahue, Chmelecki & Peltier, Portland, for appellant Gregory Nisbet

Janet T. Mills, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine