1997 ME 27

### MAINE YANKEE ATOMIC POWER COMPANY

v.

### STATE TAX ASSESSOR.

Supreme Judicial Court of Maine.

Argued Jan. 6, 1997.

Decided Feb. 20, 1997.

Michael S. Wilson (orally) Pierce, Atwood, Portland, for plaintiff.

Andrew Ketterer, Attorney General and Thomas A. Knowlton, Asst. Atty. General (orally), Augusta, for defendant.

Before WATHEN, C.J., and GLASSMAN, CLIFFORD, RUDMAN, DANA and LIPEZ, JJ.

GLASSMAN, Justice.

[¶ 1] The State Tax Assessor appeals from a summary judgment entered in the Superior Court (Kennebec County, Atwood, J.) in favor of Maine Yankee Atomic Power Company (Maine Yankee) vacating the Assessor's determination on reconsideration and ordering a refund to Maine Yankee of the use taxes assessed on its purchase of two transformers. The Assessor contends the court erred by concluding that two "step-up"

transformers qualified for the production exemption provided by 36 M.R.S.A. § 1760(31) (1990).[1] We disagree and affirm the judgment.

[¶ 2] The relevant facts are not in dispute. Maine Yankee owns an atomic power plant in Wiscasset that produces electricity for ten customers. The customers take delivery of the electricity from Maine Yankee at a switchyard not owned by Maine Yankee but located on its property in Wiscasset. Maine Yankee's contract with its customers requires that the electricity be delivered to the switchyard at 345,000 volts. The customers distribute the electricity acquired by them in bulk to their own service area using downstream transformers to "step-down" the high voltage electricity to lower voltages suitable to the requirements of the general public. Maine Yankee does not participate in this redistribution.

[¶ 3] Two phases are required to produce the electricity at the required 345,000 volts. The first phase, performed by the reactor or main generator creates or generates electricity at 22,000 volts which has very little commercial value because it cannot be efficiently transmitted. The second phase, performed by the two transformers located on Maine Yankee's property near the turbine building that houses the main generator, alters the electricity received from the main generator by increasing the voltage to 345,000 and decreasing the amperage. Following this process, the electricity is in the transmittable form required by Maine Yankee's customers.

[¶ 4] In July 1993, Maine Yankee paid under protest the use tax assessed on its June 1993 purchase and installation of two transformers to replace two older units. Following the Assessors denial of its request for reconsideration and for a refund of the tax, Maine Yankee filed the present complaint seeking a de novo determination of the issue by the Superior Court, pursuant to 36 M.R.S.A. § 151 (Supp.1996), 5 M.R.S.A. § 11002 (1989) and M.R.Civ.P. 80C. Follow-

---

1. 36 M.R.S.A. § 1760(31) provides an exemption from sales and use tax for:

Sales of machinery and equipment for use by the purchaser directly and primarily in either the production of tangible personal property, which property is intended to be sold or leased ultimately for final use or consumption, or the production of tangible personal property pursuant to a contract with the United States Government or any agency thereof.

ing a hearing on the parties' cross-motions for a summary judgment, the court concluded that the transformers were used "directly and primarily in ... the production" of tangible personal property and were within the exemption provided by section 1760(31). From the judgment vacating the Assessor's determination on reconsideration and ordering a refund to Maine Yankee of the assessed taxes with interest, the Assessor appeals.

[¶ 5]   In reviewing the grant of a motion for a summary judgment, we examine the evidence in the light most favorable to the nonprevailing party to determine whether the trial court committed an error of law. *Enerquin Air, Inc. v. State Tax Assessor,* 670 A.2d 926, 928 (Me.1996) (citation and quotation omitted).

[¶ 6]   Section 1760(31) provides an exemption from both sales and use taxation on those "[s]ales of machinery and equipment for use by the purchaser directly and primarily in ... the production of tangible personal property, which property is intended to be sold or leased ultimately for final use or consumption...." The word "directly" is statutorily defined as follows:

> "Directly" when used in relation to production of tangible personal property, refers to those activities or operations which constitute an integral and essential part of production, as contrasted with and distinguished from those activities or operations which are simply incidental, convenient or remote to production.

36 M.R.S.A. § 1752(2–A) (1990). "'Primarily', when used in relation to production means more than 50% of the time." 36 M.R.S.A. § 1752(9–A) (1990). "Production" is defined as follows:

> "Production" means an operation or integrated series of operations engaged in as a business or segment of a business which transforms or converts personal property by physical, chemical or other means into a different form, composition or character from that in which it originally existed.

Production includes manufacturing, processing, assembling and fabricating operations which meet the definitional requisites.

Production does not include biological processes, wood harvesting operations, the severance of sand, gravel, oil, gas or other natural resources produced or severed from the soil or water, or activities such as cooking or preparing drinks, meals, food or food products by a retailer for retail sale. The foregoing are examples of activities that are not included within the term "production."

36 M.R.S.A. § 1752(9–B) (1990).

[¶ 7]   Pursuant to the statutory authority provided by 36 M.R.S.A. § 112(1) (Supp. 1996),[2] the Assessor promulgated the following rule:

> "Production" referred to in § 1752(9–B) commences with the movement of raw materials to the first production machine after their receipt and storage at production site (after receipt if the raw materials are not stored) and ends with the completion of the finished product, including any packaging operation. The acquisition of raw materials, the transportation of raw materials or good in process between production sites, and administrative and distributive operations do not constitute production.

08–125 C.M.R. 303.01(A) (Bur. of Tax., effective June 1, 1951).

[¶ 8]   It is undisputed that electricity is tangible personal property, 36 M.R.S.A. § 1752(17) "intended to be sold ... ultimately for final use or consumption." 36 M.R.S.A. § 1760(31). It is also undisputed that the "primarily" requirement is satisfied because the only function of the transformers is to transform electricity from 22,000 volts to 345,000 volts, for which they are used more than 50% of the time. 36 M.R.S.A. § 1752(9–A). The sole issue before us is whether the transformers are used "directly ... in ... the production" of the electricity.

---

**2.** Section 112(1) provides in part: "The State Tax assessor shall administer and enforce the tax laws ..., and may adopt rules...."

[¶ 9] The Assessor first contends that the trial court erred by concluding that the transformers are directly involved in the production of electricity because the production process stops when the electricity leaves the main generator and, accordingly, the transformers are used in the distribution of electricity, not the production. We find the Assessor's contention unpersuasive. By agreeing that the transformers change the "form, character or composition" of the electricity, the Assessor concedes that the plain language of the statutory definition of production is satisfied. *See* 36 M.R.S.A. § 1752(9–B); *cf. SST & S, Inc. v. State Tax Assessor*, 675 A.2d 518, 522 (Me.1996) (where equipment did not transform fish into different form, composition or character, the production exemption did not apply). Moreover, the Assessor's rule defining production states that the production process begins with the "movement of raw materials to the first production machine ... and ends with the completion of the finished product, including any packaging operation." Rule 303.01(A). Maine Yankee does not have a finished product ready for its customers until the transformers process the electricity to the required 345,000 volts.

[¶ 10] The Assessor next contends that the transformers are not directly involved in production because they are not an "integral and essential part of production" of electricity as required by section 1752(2–A). We disagree. The only product Maine Yankee produces for sale is bulk electricity at 345,000 volts. Because this product could not be produced without the transformers, they are both an integral and essential part of the production process. *See UAH–Hydro Kennebec v. State Tax Assessor*, 659 A.2d 865, 867 (Me.1995) (gates necessary to efficient functioning of hydroelectric facility essential to production); *International Paper Co. v. Halperin*, 428 A.2d 1182, 1183–84 (Me.1981) (boiler stacks necessary to keep boilers operating efficiently are directly involved in production of paper). Accordingly, we agree with the trial court that the two transformers are within the exemption provided by 36 M.R.S.A. § 1760(31).

The entry is:

Judgment affirmed.