1998 ME 205

**Robert H. FOSTER et al.**

**v.**

**STATE TAX ASSESSOR.**

Supreme Judicial Court of Maine.

Argued Sept. 3, 1997.

Decided Aug. 7, 1998.

Brent A. Singer (orally), Rudman & Winchell, L.L.C., Bangor, for plaintiffs.

Andrew Ketterer, Attorney General, Thomas A. Knowlton (orally), Clifford B. Olson, Asst. Attys. Gen., Augusta, for defendant.

James G. Good, Jonathan A. Block, Pierce Atwood, Portland, for amicus curiae Maine Chamber & Business Alliance.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, DANA, and LIPEZ *, JJ.

CLIFFORD, Justice.

[¶ 1] Robert H. and Caroline M. Foster and Amr and Mary Ismail appeal from the judgment entered in the Superior Court (Kennebec County, *Alexander, J.*) affirming the State Tax Assessor's denial of certain income tax credits pursuant to the investment tax credit statute, 36 M.R.S.A. § 5219–E (Supp.1996).[1] They contend that the court erred by concluding that a wastewater pretreatment facility did not constitute machinery or equipment eligible for the investment tax credit and by concluding that the facility was not used directly in the production of tangible personal property. Because the facility was not used in the production of tangible personal property within the meaning of section 5219–E(1)(C)(2), we affirm the judgment.

[¶ 2] The following facts are undisputed. Robert Foster and Amr Ismail are shareholders of Maine Wild Blueberry Company (Company). The Company owns and operates a plant in Machias where fresh fruit is processed into individually quick frozen fruit, which is further processed into various products, including laser-scanned berries, frozen fruit puree, canned fruit, and infused, airdried fruit. The Company uses water to wash, convey, separate, rinse and freeze the berries; to process the frozen fruit; to remove frost from the freezing tunnels daily; and to maintain compliance with sanitation standards set by FDA regulations.

[¶ 3] One of the methods by which the Company disposes of wastewater is through discharge into the Town of Machias sewer system. By late 1990, the Company's operations had tripled and the amount of wastewater generated had grown proportionately. As a result, the Town became concerned that its sewer system could not handle the volume of wastewater discharged by the Company. In 1991, the Town and the Company entered into an agreement imposing restrictions on, *inter alia*, the daily gallonage and the amount of solids that the Company could discharge into the Town's sewer system. The Company was required to pay surcharges if it violated the agreement.

[¶ 4] To comply with the restrictions in the agreement, the Company hired engineers and contractors to design and construct a wastewater pre-treatment facility on real estate owned by the Company. The purpose of the facility was to "reduce the amount of sugars and other organic material in the wastewater by screening, filtering, and chemically and organically treating the water before it entered [the Town's] sewer system." By the end of 1991, the facility was substantially completed. It consists of two partially underground concrete basins that collect

---

* Justice Lipez sat at oral argument and participated in the initial conference, but resigned before this opinion was adopted.

1. Title 36 M.R.S.A. § 5219–E (Supp.1997) provides in part:

   **1. Definitions.** As used in this section, unless the context otherwise indicates, the following terms have the following meanings.

   **A.** "Directly" has the same meaning as defined in section 1752, subsection 2–A.

   **B.** "Investment credit base" means the total original basis, without adjustment, for federal income tax purposes, of the taxpayer of all machinery and equipment placed in service for the first time in this State by the taxpayer or other person during any of the prior 5 taxable years, except in taxable years ending in 1995, the prior 6 taxable years, excluding the basis of machinery and equipment placed in service in this State prior to January 1, 1989. . . .

   **C.** "Machinery and equipment" means machinery and equipment as defined in section 1752, subsection 7–B, with a situs in the State as of the last day of the immediately prior taxable year:

   (1) That was subject to an allowance for depreciation under the Code by the taxpayer as of the last day of the immediately prior taxable year or would have been subject to an allowance for depreciation under the Code by the taxpayer as of that date, but for the fact that the property had been fully depreciated; and

   (2) That is used directly and primarily in the production of tangible personal property intended to be sold or leased ultimately for final use or consumption.

   **D.** "Primarily" has the same meaning as defined in section 1752, subsection 9–A.

   **E.** "Production" has the same meaning as defined in section 1752, subsection 9–B.

   **2. Credit allowed.** A taxpayer is allowed a credit against the tax imposed by this Part for each taxable year equal to 1.0% of the investment credit base of the taxpayer. . . .

wastewater, six aerators on floating beds in the basins, and an adjacent concrete block and brick building containing the control components, various piping, electrical wiring and fixtures. The aerators are held in place by guide cables affixed to the sides of the basins. Wastewater is constantly conveyed, via floor drains and pipes, to the facility to allow the continual functioning of the production processes described above. A roto-screening device removes solids such as whole berries from the water before it enters clarification tanks, which are located in the concrete block and brick building adjacent to the bins. While the water is in the clarification tanks, additional pollutants settle to the bottom. The overflow is then discharged into two 250,000 gallon aeration basins where microorganisms digest the remaining biodegradable solids. The sludge settles to the bottom and the clarified supernate rises to the top, is siphoned off, and sent to the Town's wastewater treatment facility.

[¶ 5] On several occasions, the Company exceeded the daily limits in the discharge agreement and incurred surcharges totalling more than $100,000. In 1992, the Company paid contractors to make enhancements to the facility. The parties stipulated that these enhancements were necessitated by design deficiencies in the facility which resulted in the surcharges.

[¶ 6] The Fosters and the Ismails filed joint Maine income tax returns for 1992 and 1993 and claimed investment tax credits with respect to the facility and the 1992 enhancements.[2] The Bureau of Taxation disallowed the credits. On the taxpayers' petitions for administrative reconsideration, *see* 36 M.R.S.A. § 151 (Supp.1997), the Assessor upheld the disallowances. Pursuant to 5 M.R.S.A. § 11002 (1989), 36 M.R.S.A. § 151 and M.R. Civ. P. 80C, the taxpayers filed a petition for review in the Superior Court. The case was submitted for trial on a stipulated record. The court concluded "that the term 'machinery and equipment' cannot include real estate and fixtures that are part of the real estate," and held that the facility and

the 1992 enhancements were items of real estate ineligible for the investment tax credits. Alternatively, the court concluded that:

"directly and primarily" used in production of goods to be sold for final use means machinery and equipment actually used to make the product for sale. Excluded from this interpretation would be machinery, equipment or facilities used to receive, process, transport and store raw material—here blueberries—before they are turned into a product for sale.

Also excluded would be the pretreatment facility—to the extent it is not real estate—because it is only indirectly involved in production. It did not even exist for the first seven years of production. Further, the record indicates that much of the use of the pretreatment facility results from the cleaning, storage, and preparation of raw materials for storage or production before the direct production processing occurs.

From a judgment in favor of the Assessor, the taxpayers appealed.

■■■ [¶ 7] Judicial review of decisions by the Assessor is governed by 36 M.R.S.A. § 151, which provides that the Superior Court "shall conduct a de novo hearing and make a de novo determination of the merits of the case." We therefore review the court's interpretation of the statute directly. *See Apex Custom Lease Corp. v. State Tax Assessor,* 677 A.2d 530, 532 (Me.1996). "The meaning and construction of statutory language presents a question of law." *Community Telecomm. Corp. v. State Tax Assessor,* 684 A.2d 424, 426 (Me.1996). In the interpretation of a statute, we seek to effectuate the intent of the Legislature, which is ordinarily gleaned from the plain language of the statute. *Interstate Food Processing Corp. v. Town of Fort Fairfield,* 1997 ME 193, ¶ 4, 698 A.2d 1074, 1075.

■ [¶ 8] We recently affirmed the "well settled principle that 'taxation is the rule and tax exemption is the exception[.]'" *SST & S, Inc. v. State Tax Assessor,* 675 A.2d 518, 521

---

2. Because the Company is an S corporation, its credits pass through to the shareholders, 36

M.R.S.A. § 5219–E(4) (Supp.1997).

(Me.1996) (*quoting Connecticut Bank & Trust Co. v. City of Westbrook*, 477 A.2d 269, 271 (Me.1984)). This rule requires a taxpayer seeking an exemption to establish that the claimed exemption is "unmistakably within the spirit and intent" of the statute. *Episcopal Camp Found., Inc. v. Town of Hope*, 666 A.2d 108, 110 (Me.1995). We see no reason why this rule of construction should not apply equally to a tax credit statute.

[¶ 9] The investment tax credit statute allows a taxpayer a credit against the taxpayer's Maine income tax liability for each taxable year equal to 1.0% of the taxpayer's investment credit base. *See* 36 M.R.S.A. § 5219–E(2) (Supp.1997). The "investment credit base" is defined, in pertinent part, as "the total original basis, without adjustment, for federal income tax purposes, of the taxpayer of all machinery and equipment ...." *Id.* § 5219–E(1)(B). The tax credit statute defines "machinery and equipment" in part as:

> machinery and equipment as defined in section 1752, subsection 7–B, with a situs in the State as of the last day of the immediately prior taxable year:
>
> . . . .
>
> (2) That is used directly and primarily in the production of tangible personal property intended to be sold or leased ultimately for final use or consumption.

*Id.* § 5219–E(1)(C). The Assessor contends that the pre-treatment facility is not used in the "production" of tangible personal property, and therefore does not qualify for the credit.

[¶ 10] For purposes of the tax credit statute, "production" is defined as:

> an operation or integrated series of operations engaged in as a business or segment of a business which transforms or converts personal property by physical, chemical, or other means into a different form, composition or character from that in which it originally existed.
>
> Production includes manufacturing, processing, assembling and fabricating opera-

tions which meet the definitional requisites.

36 M.R.S.A. § 1752(9–B) (1990). Pursuant to 36 M.R.S.A. § 112(1) (1990), the Assessor promulgated the following rule:

> "Production" referred to in § 1752(9–B) commences with the movement of raw materials to the first production machine after their receipt and storage at production site (after receipt if the raw materials are not stored) and ends with the completion of the finished product, including any packaging operation. The acquisition of raw materials, the transportation of raw materials or goods in process between production sites, and administrative and distributive operations do not constitute production.

Me. Bur. of Tax. Rule 303.01(A) (effective June 1, 1951). In *SST & S, Inc. v. State Tax Assessor*, 675 A.2d 518 (Me.1996), we observed that this rule was an amplification of, and not inconsistent with, the definition of production contained in section 1752(2–A). *See* 675 A.2d at 521.

[¶ 11] In *SST & S*, the issue presented was whether icing equipment and totes used by the taxpayer to maintain the firmness of fish during transportation from the dock to the taxpayer's processing facility were exempt from sales and use tax pursuant to 36 M.R.S.A. § 1760(31). That section provides an exemption for machinery and equipment "use[d] by the purchaser directly and primarily in ... the production of tangible personal property ...." *Id.* The taxpayer conceded that the icing equipment itself did not transform or convert the fish into a different form, composition or character, but argued that the equipment was exempt because it was part of an integrated process which met the statutory definition of "production." We rejected that argument and held that the Assessor rationally could have determined that the equipment was not used directly in the production of tangible personal property.[3] 675 A.2d at 522. We noted that "[t]he *process effected by the equipment* does not 'transform[ ] or convert[ ] [the fish] by physical, chemical, or other means into a different

---

**3.** The scope of our review in *SST & S* was more limited than the review we undertake here. *See SST & S*, 675 A.2d at 520 (*citing* 36 M.R.S.A.

§ 151, as interpreted by *Jackson Advertising Corp. v. State Tax Assessor*, 551 A.2d 1365, 1366 (Me.1988)).

form, composition or character from which it originally existed' " *Id.* (*quoting* 36 M.R.S.A. § 1752(9–B)) (emphasis added).

[¶ 12] In *Maine Yankee Atomic Power Co. v. State Tax Assessor,* 1997 ME 27, 690 A.2d 497, we were presented the issue of whether transformers used by the taxpayer were used "directly ... in the production" of electricity. *Id.* at ¶ 8, 690 A.2d at 499. The transformers adjusted the voltage and amperage of electricity before distribution to the taxpayer's customers. We concluded that the plain language of section 1752(9–B) was satisfied because the Assessor agreed that the transformers "change the 'form, [composition or character]' of the electricity ...." *Id.* at ¶ 9, 690 A.2d at 500 (*quoting* 36 M.R.S.A. § 1752(9–B)).[4]

■ [¶ 13] In this case, although the pre-treatment facility might be viewed as a part of an integrated production process, the facility itself does not meet the requirement of section 1752(9–B). Like the icing equipment in *SST & S* and unlike the transformers in *Maine Yankee,* the facility does not transform or alter the composition of the tangible personal property.[5] The sole purpose of the pre-treatment facility in this case is to reduce the amount of organic material in the wastewater generated by screening and treating the water before introduction into the Machias sewer system. Wastewater is piped to the facility after it is used in the various steps of the production process. After clarification, the water is not circulated back into the Company's production process, but rather is siphoned off and sent to the Town's wastewater treatment facility. The facility does not alter or convert the blueberries into a different form, composition or character. Accordingly, the facility is not used in the production of tangible personal property, within the

meaning of 36 M.R.S.A. § 5219–E(C)(2). *See SST & S,* 675 A.2d at 522; *see also Commissioner of Revenue v. V.H. Blackinton & Co., Inc.,* 420 Mass. 259, 649 N.E.2d 160 (1995) (holding that pollution control equipment did not qualify for manufacturing exemption to sales tax absent determination that equipment effected physical change on property to be sold); *Ohio Ferro–Alloys Corp. v.. Kosydar,* 34 Ohio St.2d 113, 296 N.E.2d 533 (1973) (equipment used to weigh metallic ore prior introduction into furnace did not effect a change in the form of the ore and therefore was not used in production); *but see Department of Revenue v. State Contracting & Stone Co.,* 572 S.W.2d 421 (Ky.1978) (holding that pollution control equipment mandated by regulatory authorities was used directly in the production of asphalt).

[¶ 14] The taxpayers contend that "production" includes "processing operations" and the facility is clearly part of the processing of the blueberries. This argument, however, overlooks the requirement that processing operation "meet the definitional requirements" in order to qualify as "production." *See* 36 M.R.S.A. § 1752(9–B). A reasonable construction of the statute assumes that "definitional requirements" refers to the requirement that the operation "transform[ ] or convert[ ] personal property by physical, chemical or other means into a different form, composition or character from that in which it originally existed." 36 M.R.S.A. § 1752(9–B).

The entry is:

Judgment affirmed.

---

4. In *UAH–Hydro Kennebec v. State Tax Assessor,* 659 A.2d 865 (Me.1995), we held that bascule gates attached to a dam at the taxpayer's hydroelectric facility were used directly and primarily in the production of tangible personal property. *Id.* at 867–68. Although we were unpersuaded by the Assessor's contention that the gates were used for storage, and not in production, we did not discuss the language of section 1752(9–B) or how the gates transformed or converted the personal property. *See also International Paper Co. v. Halperin,* 428 A.2d 1182 (Me.1981) (holding that four emission stack and breeching systems were used directly and primarily in the produc-

tion of paper). In *International Paper,* we did not address the statutory definition of "production" because the parties stipulated that the stack and breeching systems were essential to the production of paper. *International Paper,* 428 A.2d at 1184.

5. Although the freezing equipment and totes at issue in *SST & S* and the pre-treatment facility in this case are both important parts of the taxpayers' operations, neither involves a process that meets the statutory definition of production.