STATE OF MAINE                                  BUSINESS & CONSUMER COURT
CUMBERLAND, ss.                                 LOCATION: PORTLAND
                                                DOCKET NO. BCD-AP-19-01


STATE TAX ASSESSOR                    )
                                      )
        Petitioner/ Cross-Respondent, )
                                      )   **ORDER ON CROSS MOTIONS FOR**
        v.                            )   **SUMMARY JUDGMENT**
                                      )
TRACFONE WIRELESS, INC.,              )
                                      )
        Respondent/ Cross- Petitioner. )
                                      )


Before the Court are the Petitioner State Tax Assessor's (the "Assessor's"), and

Respondent Tracfone Wireless, Inc.'s ("Tracfone's") cross motions for summary judgment

pursuant to Rules 7, 56, and 134 of the Maine Rules of Civil Procedure.

In its motion for summary judgment, Tracfone asserts that its Safelink services are not

subject to the Prepaid Wireless Fee for multiple reasons. First, Tracfone asserts that Safelink

services are not—and cannot be—paid for in advance, and as such do not meet the statutory

definition of prepaid wireless telecommunications service subject to the Prepaid Wireless Fee.

Second, Tracfone asserts that Safelink subscribers are not wireless "consumers" engaged in a

"retail transaction", because the subscribers do not pay for their phone service, and thus liability

for the Prepaid Wireless Fee is not triggered. Third, Tracfone contends that the Assessor lacks

authority to audit or otherwise enforce the Prepaid Wireless Fee. Finally, Tracfone asserts that

payment of the Prepaid Wireless Fee is preempted by federal law. Tracfone also asks this Court

to uphold BOTA's determination that its non-Lifeline services were subject to sales tax rather

than the service provider tax.

1

Conversely, the STA asks this court to uphold BOTA's determination that, during the audit period, Tracfone's Lifeline services were subject to the Prepaid Wireless Fee. The STA also asks the Court to overrule BOTA's determination that both Tracfone's Lifeline and non-Lifeline services are subject to sales tax, and to instead find that these services are subject to the service provider tax. The State Tax Assessor is represented by Assistant Attorney General Thomas Knowlton and Assistant Attorney General Kimberly Patwardhan. Tracfone is represented by Attorney Jonathan Dunitz.

## FACTUAL BACKGROUND

Tracfone is a wireless telecommunications service provider with millions of subscribers in the United States. Its business primarily consists of three components: 1) its Safelink Service, which offers federal Lifeline service to qualifying low-income households; 2) the retail sale of prepaid wireless goods and services; and 3) the resale of prepaid wireless goods and services to retailers and distributors at wholesale. (Resp't's S.M.F. ¶ 1.) The federal Lifeline program was enacted in 1985, and expanded access to telephone service to low-income Americans. The Universal Service Administrative Company ("USAC") manages the Universal Service Fund ("FUSF"), and administers the Lifeline program. 47 C.F.R. § 54.702(b). Specifically, USAC collects FUSF funds and distributes them as subsidies to telecommunication companies that offer federally approved services, including Lifeline. *Id.* § 57702(b). Over the relevant time period, USAC paid each participating telecommunications company $9.25 per month for each of its subscribers who qualified for service in the month preceding the payment.[1] (Stip. ¶¶ 11, 12.)

---

[1] Lifeline services are available to individuals with a gross annual income at or below 135% of the federal poverty line, 47 C.F.R. § 54.409(a)(1); or if an individual in the household participates in SNAP, Medicaid, Supplemental Security Income, federal public housing assistance, or another qualifying program. *Id.* § 54.409(a)(2).

Lifeline customers in Maine who desired Safelink service would submit a written application to Tracfone. (Pet'rs' S.M.F. ¶ 31.) Lifeline customers would enter into a "legally binding agreement" with Tracfone that governed Tracfone's provision of service to the customers. (Pet'rs' S.M.F. ¶ 32.) Among other requirements, Tracfone's Lifeline customers would be required to verify their continuing eligibility for the program, promised not to give away or resell their Lifeline service, and agreed to binding arbitration for dispute resolution. (Pet'rs' S.M.F. ¶ 35.) Likewise, in accordance with FCC regulations, Tracfone's Lifeline customers in Maine and members of their households gave up the right to procure service from any other provider. 47 C.F.R. §§ 54.409(c), 54.410(d)(3)(vi).

After applying, and qualifying for Lifeline services, during the Audit Period, a Safelink customer would receive access to local and long distance calls, the ability to send and receive text messages, to utilize directory and operator assistance, and access to emergency 9-1-1 services from their mobile telephones. (Stip. ¶ 27.) At the beginning of the Audit Period, Safelink customers received 68 airtime minutes per month, and by the end of the Audit Period customers were entitled to 250 airtime minutes per month. (Stip. ¶¶ 29-30.) These airtime minutes would decline in a known amount when customers made telephone calls, sent or received text messages, checked their voicemail, and accessed directory services. *Id.* Tracfone would eventually receive a reimbursement from USAC for the $9.25 worth of service advanced to the Lifeline customer, per month. (Stip. ¶ 33.)

Tracfone was first certified as an Eligible Telecommunications Carrier for the purpose of providing Lifeline services in 2010. (Stip. ¶ 24.) In providing Lifeline services to low-income Maine households, Tracfone offered free smartphones to users who desired them. Lifeline subscribers who committed to receiving services from Tracfone would not receive a monthly

3

bill, and instead Tracfone would receive the $9.25 subsidy from USAC. (Resp't's S.M.F. ¶¶ 4, 5.)

On April 1, 2014, the STA sent Tracfone an "Intent to Audit" letter with a list of requested documentation.(Stip. ¶ 11.) Maine Revenue Services ("MRS") presented its audit findings on July 20, 2016. (Resp't's S.M.F. ¶ 6.) The Audit Period covered by those findings is December 1, 2012 through January 31, 2016. (Stip. ¶ 36.)

According to MRS's findings, Tracfone had failed to pay a Prepaid Wireless Fee, due for each month of Lifeline service it provided to subscribers for whom USAC paid a subsidy to Tracfone. (Stip. ¶¶ 43, 47). M.R.S. also found that Tracfone's provision of Safelink service to Maine residents constituted a "retail sale" that was subject to Service Provider Tax ("SPT"), and determined that the sale price of Lifeline is the full amount of the federal USAC subsidy received by Tracfone. (Stip. ¶¶ 41, 42.) On July 28, 2016, the Assessor issued two assessments to Tracfone. (Stip. ¶ 43.) First, an assessment was issued for the Prepaid Wireless Fee in the amount of $1,208,459.42 including interest. (Stip. ¶ 43.) Second, the Assessor issued an assessment for SPT in the amount of $439,333.25, including interest. (Stip. ¶ 43). In total, the Assessor alleged that Tracfone owed $1,647,792.67. Tracfone filed a request for reconsideration of the assessments, which was denied on March 23, 2017.

Finally, on May 22, 2017, Tracfone filed an appeal to the Maine Board of Tax Appeals ("BOTA"). (Stip. ¶ 43.) BOTA issued its decision on April 21, 2018, finding that Tracfone correctly charged sales tax and not SPT on its non-Lifeline sales. (Resp't's S.M.F. ¶ 15.) However, BOTA upheld the Assessor's determination that Lifeline service during the Audit Period was subject to the Prepaid Wireless Fee, while finding that Lifeline services were also subject to sales tax rather than SPT. Tracfone filed a request for reconsideration, which was

denied on June 4, 2018. The Assessor petitioned for review in the Superior Court, after which Tracfone petitioned. The case was eventually transferred to the Business and Consumer Court.

## LEGAL STANDARD

When a party seeks review of a decision issued by the STA, the Court must make a de novo determination of the merits of the case and make its own determination as to all questions of fact or law. *Blue Yonder, LLC v. State Tax Assessor,* 2011 ME 49, ¶ 6, 17 A.3d 667 (citing 36 M.R.S. § 151). The Court does not accord heightened deference to the STA or BOTA's decision in interpreting tax statutes. *Id.* When examining tax statutes, Maine Courts look to the plain meaning of the language to give effect to the legislative intent. *Foster v. State Tax Assessor,* 1998 ME 205, ¶ 7, 716 A.2d 1012. Tax statutes must be construed strictly against the taxing authority. *BCN Telecom, Inc. v. State Tax Assessor,* 2016 ME 165, ¶ 10, 151 A.3d 497. However, the Petitioner has the burden of proof on all factual and legal questions. 36 M.R.S. ¶ 151-D(10)(I) (Supp. 2018).

A party is entitled to summary judgment pursuant to M.R. Civ. P. 56(c) when the summary judgment record reflects there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A fact is material if it has the potential to affect the outcome of the suit, and a genuine issue of material fact exists when the fact-finder must choose between competing versions of the truth, even if one party's version appears more credible or persuasive. Cross motions for summary judgment "neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se." *F.R. Carroll, Inc. v. TD Bank, N.A.,* 2010 ME 115, ¶ 8, 8 A.3d 646 (quoting *Wightman v. Springfield Terminal Ry. Co.,* 100 F.3d 228, 230 (1st Cir. 1996)).

## DISCUSSION

### I. Tracfone's Safelink Service Qualifies as a Prepaid Wireless Telecommunication Service.

According to Maine Law, prepaid wireless telecommunication services are defined as:

> cellular or wireless telecommunications service that allows a caller to dial 9-1-1 to access the E-9-1-1 system, which service must be paid for in advance and is sold in predetermined units or dollars that declines with use in a known amount.

25 M.R.S. § 2921(13); 35-A M.R.S. § 7102(4). Because, by their nature, "prepaid wireless telecommunications services are provided without a periodic bill, the collection of fees and surcharges regarding prepaid wireless telecommunications services must be accomplished according to a methodology that differs from the collection of fees and surcharges on other wireless telecommunications services..." As such, the legislature enacted the Prepaid Wireless Fee as an alternative method of taxation for prepaid wireless providers, such as Tracfone, who do not maintain a traditional, monthly billing relationship with subscribers. *See* 35-A M.R.S. § 7101(6).

Pursuant to 35-A M.R.S. § 7104-C(2)(A), "a seller of prepaid wireless telecommunications services shall collect the prepaid wireless fee from the prepaid wireless consumer for each retail transaction occurring in this State." As a result of the Audit, the Assessor determined Tracfone had failed to remit the Prepaid Wireless Fee due on its provision of Safelink services. Conversely, Tracfone asserts that Safelink services provided during the Audit Period should not be subject to the Prepaid Wireless Fee because Lifeline customers in Maine were not engaged in "retail transactions" for "prepaid wireless telecommunications services". The Court will address each of Tracfone's arguments in turn, to determine whether: 1) Safelink services were paid in advance, and 2) Lifeline customers were engaged in "retail transactions.

6

### a. Tracfone's Safelink Service was "Paid in Advance."

Tracfone first argues that because Tracfone provided Safelink service to its Lifeline Customers prior to receiving payment from USAC, the service cannot be deemed "paid in advance" as is necessary to be deemed prepaid wireless telecommunications service under 35-A M.R.S. §7102(4). Although the Court accepts Tracfone's contention that it received the federal Lifeline subsidy after customers activated, and therefore used the service, this fact alone does not negate the prepaid nature of Tracfone's Safelink service.

According to the record, Lifeline customers in Maine who desired Safelink service would submit a written application to Tracfone. (Pet'rs' S.M.F. ¶ 31.) Lifeline customers would enter into a "legally binding agreement" with Tracfone that governed Tracfone's provision of service to the customers. (Pet'rs' S.M.F. ¶ 32.) Among other requirements, Tracfone's Lifeline customers would be required to verify their continuing eligibility for the program, promised not to give away or resell their Lifeline service, and agreed to binding arbitration for dispute resolution. (Pet'rs' S.M.F. ¶ 35.) Likewise, in accordance with FCC regulations, Tracfone's Lifeline customers in Maine and members of their households gave up the right to procure service from any other provider. 47 C.F.R. §§ 54.409(c), 54.410(d)(3)(vi).

After applying, and qualifying for Lifeline services, during the Audit Period, a Safelink customer would receive access to local and long distance calls, the ability to send and receive text messages, to utilize directory and operator assistance, and access to emergency 9-1-1 services from their mobile telephones. (Stip. ¶ 27). At the beginning of the Audit Period, Safelink customers received 68 airtime minutes per month, and by the end of the Audit Period customers were entitled to 250 airtime minutes per month. (Stip. ¶¶ 29-30). These airtime minutes would decline in a known amount when customers made telephone calls, sent or

received text messages, checked their voicemail, and accessed directory services. *Id.* Tracfone would eventually receive a reimbursement from USAC for the $9.25 worth of service advanced to the Lifeline customer, per month. (Stip. ¶ 33). Thus, the Court the Court finds that Tracfone's Safelink service unambiguously allows customers to access the E-9-1-1 system, and to purchase predetermined units that decline in a known amount.

Other than receiving the eventual reimbursement from USAC, Tracfone's Safelink service operates almost identically to its non-Lifeline services. It is undisputed that Tracfone's non-Lifeline services can be characterized as "prepaid wireless services"; consumers purchase in advance, predetermined units that decline in a known quantity with use. However, when those same services are translated to the Lifeline context, and instead monetary compensation comes via a federal reimbursement, Tracfone insists the services can no longer be classified as prepaid.

In support of its assertion that Lifeline services cannot be classified as "prepaid", Tracfone cites 47 C.F.R. § 54.407(c), which details when a wireless carrier receives a federal Lifeline subsidy:

> an eligible telecommunications carrier offering a Lifeline service that does not require the eligible telecommunications carrier to assess and collect a monthly fee from its subscribers:
>
> (1) Shall not receive universal service support for a subscriber to such Lifeline service *until the subscriber activates the service* by whatever means specified by the carrier, such as completing an outbound call; and
>
> (2) After service activation, an eligible telecommunications carrier shall only continue to receive universal service support reimbursement for such Lifeline service provided to subscribers *who have used the service within the last 30 days,* or who have cured their non usage. . .

47 C.F.R. § 54.407(c)(emphasis added). As demonstrated above, wireless telecommunication service providers like Tracfone who provide service to Lifeline customers receive a subsidy from USAC after the subscriber activates the service. Nonetheless, the fact that reimbursements to

8

Lifeline providers occur after the provision of services, does not alone determine whether the service qualifies as "prepaid."

While Tracfone paints Safelink as a purely post-paid provision of telecommunications services, the Court sees the relationship between Lifeline customers, Tracfone, and USAC differently. During the Audit Period, when a customer applied for Safelink service, the customer provided valuable consideration: the customer agreed to Tracfone's terms of service, binding arbitration for dispute resolution, and gave up the right to receive Lifeline service from any other telecommunications provider. (Pet'rs' S.M.F. ¶¶ 31-35.) In exchange, Tracfone would advance Safelink services, worth $9.25, to each customer. Tracfone was motivated to provide this service because it would receive the $9.25 federal Lifeline subsidy from USAC. Due to Tracfone's choice of business model, it did not send Lifeline customers in Maine periodic bills. The Court finds that Tracfone advanced a credit worth $9.25 to each Lifeline customer per month. Using this credit, Lifeline customers would be provided a predetermined set of units, or minutes, which declined with use. Thus, Tracfone's Safelink service bears the hallmarks of a prepaid wireless telecommunications service. The character of these services is not altered simply by the timing of the federal reimbursement.

Tracfone's own characterizations of its Safelink service bolster the Court's decision. On countless occasions, and in some under the penalty of perjury, Tracfone described its Safelink service as "prepaid." For instance, in its Rule 30(b)(6) deposition, Tracfone conceded: "Even under Lifeline, it's a prepaid model that restricts somebody from using more than what they are allotted under the program." (Pet'rs' S.M.F. ¶ 38; Knowlton Aff. Ex. A.) Tracfone's own admission makes clear that Safelink services are still provided according to a "prepaid model", regardless of when the USAC subsidy arrives in Tracfone's bank account.

9

**b. Tracfone's Lifeline Customers Were Consumers Engaged in Retail Transactions**

The prepaid wireless statute also provides that, "A seller of prepaid wireless telecommunications services shall collect the Prepaid Wireless Fee from the prepaid wireless consumer for each *retail transaction* occurring in this State." 35-A M.R.S. § 7104-C(2)(A) (emphasis added). Tracfone insists that its Safelink services should not be subject to the Prepaid Wireless Fee because Lifeline subscribers are not consumers engaged in retail transactions. "Retail transaction" is defined as "the purchase of prepaid wireless telecommunications service from a seller for any purpose other than resale." *See* 35 M.R.S. § 7102(7); 25 M.R.S. § 2921(15).

When a Lifeline customer sought service during the Audit Period, they did so by enrolling in Tracfone's Safelink program, after which they received a smartphone and a limited number of minutes and data each month. The customer did not provide monetary compensation directly, and instead Tracfone eventually received the federal Lifeline subsidy. In Tracfone's view, this transaction does not amount to a *purchase* from a seller.

According to the prepaid wireless statute, a "seller" is a "person who sells prepaid wireless telecommunications service to another person." 35-A M.R.S. § 7102(8); 25 M.R.S. § 2921(16). The word "purchase" is not defined by statute but can be generally defined as "to obtain by paying money or its equivalent." *Purchase*, *Merriam-Webster,* https://www.merriam-webster.com/dictionary/purchase (last accessed 4/05/2021). Tracfone was undoubtedly in the business of selling prepaid wireless telecommunications service. Maine law has long held that a "sale" includes transactions where some or all of the consideration is provided by someone other than the customer. *Flippo v. L.L. Bean, Inc.,* 2006 ME 62, ¶¶ 12-13, 898 A.2d 942; *Flik International Corp. v. State Tax Assessor*, 2002 ME 176, ¶ 19, 812 A.2d 974. Further, the

10

definition of sale price "sweeps broadly so that any value received for a retail sale is included in the sale price", even if that value is received at different times. *Id.*

Further, these Lifeline sales were also "retail transactions under the prepaid wireless statute. The record shows that Lifeline customers in Maine purchased prepaid wireless telecommunications service from Tracfone—predetermined units of telecommunications service that declined per minute of use and allowed the customer to dial 9-1-1. Lifeline customers agreed to Tracfone's terms and conditions, and USAC eventually provided Tracfone with the federal Lifeline subsidy. According to Maine law, it makes no difference whether monetary compensation came from USAC on behalf of the customers, or directly from the customers themselves. Tracfone engaged in a sale of prepaid wireless services, and Lifeline customers purchased those services, though indirectly, and engaged in a retail transaction.

Nevertheless, in support of its view that Lifeline customers were not engaged in retail transactions, Tracfone cites to two opinions issued by the Maryland and Rhode Island Attorneys General. In Maryland, when tasked with determining whether Lifeline was subject to their state E-911 fees, the Attorney General explained: "the way in which Lifeline participants receive their service is not something that most people would normally think of as a 'retail transaction.' Safelink customers do not buy their service, and no obvious transaction occurs when the [E-911] fee can be charged to the customer. *Op. Md. Atty. Gen,* 99 Op. Att'y Gen. 208, at 217 (Dec. 5, 2014). Likewise, in Rhode Island, the Attorney General issued an opinion stating that: "Since under the Safelink program, the qualifying customer receives the telephone and service free of charge, no 'purchase' takes place. . ." *Op. R.I. Atty. Gen.,* Response to Speaker Fox, at 1 (Oct. 12, 2012). The Rhode Island Attorney General concluded, "In the absence of a 'purchase' transpiring, receipt of the free phone and service under the Safelink program, in the

Department's opinion, cannot constitute a 'retail transaction' upon or for which E-911 charges may be collected." *Id.*

Although advisory opinions issued by attorney generals outside of Maine are not controlling, they do provide the Court with insight into other state's approach to taxing Lifeline services. However, as the Maryland Attorney General makes clear in its advisory opinion cited, several other states[2] require wireless service providers to collect E-911 fees from Lifeline participants, even when services are provided free of charge. Op. Md. Atty. Gen., 2014 WL 7139497, at *4 (2014). In any event, the specific tax statutes considered by the Maryland and Rhode Island Attorneys General, though similar to Maine's, are in fact different statutes.

The Court finds that Lifeline customers purchased prepaid wireless telecommunications services from Tracfone during the audit period. Lifeline consumers received pre-determined units of telecommunications service that declined per minute of use and allowed a customer to dial 9-1-1. Tracfone extended these services during the audit period, taking the form of a $9.25 credit. In addition to USAC's monthly subsidy, Lifeline subscribers provided consideration for the services they received, namely by limiting themselves to services provided by Tracfone, and agreeing to binding arbitration for dispute resolution. Tracfone's assertion that it does not have a billing relationship with its Lifeline subscribers clouds the reality of the situation. Although Tracfone does not have a traditional billing relationship with its Lifeline subscribers, it has billed Lifeline customers in other states, such as Alabama, for the state's 9-1-1 charge. Tracfone's approach to collecting wireless fees, and its variation across the United States, is a result of its own business decisions, rather than a legal necessity. For this reason, the Court finds that

---

[2] The Maryland Attorney General notes that Texas, Alabama, and Colorado require providers to collect E-911 fees from consumers.

Lifeline subscribers were indeed "consumers" engaged in "retail transaction", despite the non-traditional method in which those transactions took place.

II.     **The State Tax Assessor Has Authority to Audit and Make Assessments for Prepaid Wireless Fees**

In addition to its assertion that its Safelink service fails to qualify as "prepaid wireless service", Tracfone contends that the State Tax Assessor lacks authority to audit and make assessments against telecommunications companies for Prepaid Wireless Fees. The Assessor has "those powers expressly conferred by the legislature or those that are implied as necessary and incidental to powers expressly conferred. *Ford Motor Co. v. Darling's,* 2014 ME 7, ¶ 42, 86 A.3d 35. The Assessor has the authority to administer and enforce tax laws under Title 36 and Title 29-A. *See* 36 M.R.S. § 112(1). It also has the authority to investigate and prosecute crimes under Title 36 and Title 17-A. *Id.* The Legislature has also provided that:

> Prepaid wireless fees collected by sellers must be remitted to the State Tax Assessor. Prepaid Wireless fees must be remitted at the times and in the manner provided for the remittance of sales tax under Title 36, section 1951-A, and rules adopted pursuant to that section for the remittance of sales taxes on other than monthly basis.

35-A M.R.S. § 7104-C(2)(F). Further, when a tax return is filed, the Assessor "shall examine it and may conduct audits or examinations to determine the correct tax liability." 36 M.R.S. § 141(1) (Supp. 2020). "If the assessor determines that the amount shown on the return is less than the correct amount, the assessor shall assess the tax due the state and provide notice to the taxpayer of the assessment." *Id.* "Tax" is defined to include "the total amount required to be paid, withheld and paid over or collected and paid over with respect to estimated or actual tax liability", and "any amount assessed pursuant to this Title." 36 M.R.S. § 111(5) (Supp. 2020).

In this matter, Tracfone filed sales tax returns with the Assessor that purported to report the amount of tax due to the State during the audit period. Pursuant to 36 M.R.S. § 141(1), the

Assessor examined those returns, determined the amount of tax shown on Tracfone's returns was less than the correct amount, and assessed the tax due the State. This amount included Prepaid Wireless Fees.

Tracfone asserts that because the Prepaid Wireless Fee statute is in Title 35-A rather than Title 36, Title 29-A, or Title 17-A, the Assessor lacks express authority to enforce the Prepaid Wireless Fee. However, the Assessor has implied authority to assess unpaid Prepaid Wireless Fees against Tracfone. As noted above, the legislature requires Tracfone, as a seller, to remit Prepaid Wireless Fees to the Assessor. 35-A M.R.S. § 7104-C(2)(F). The statute would be of little to no effect if it could not be enforced by the Assessor. The Law Court has previously held that the State has the power to enforce statutes when that power to enforce is implicit within the overall regulatory scheme. *See Maine Sch. Admin Distr. No. 27 v. Me. Pub. Employees Retirement Sys.* 2009 ME 108, par. 26. Tracfone's argument that the Legislature enacted a fee that could not be collected by the State is contrary to the language and purpose of 35-A M.R.S. § 7104-C, and would create an absurd result. Thus, the Court holds that the Assessor has authority to audit telecommunications companies like Tracfone and make assessments for Prepaid Wireless Fees.

III.     **Federal Law Does Not Preempt the State Tax Assessor's Application of the Prepaid Wireless Fee to Lifeline Services**

Tracfone's final argument against liability for the Prepaid Wireless Fee during the audit period, is that the Prepaid Wireless Fee is expressly preempted by federal law. "Express preemption occurs when Congress defines 'explicitly the extent to which its enactments preempt state law." *Puritan Med. Products Co., v. Copan Italia S.P.A.,* 2018 ME 90, ¶ 13, 188 A.3d 853. Tracfone's argument relies on a 2020 decision from the District of Kansas, *Virgin Mobile USA, L.P. v. Keen,* 447 F. Supp. 3d 1071 (D. Kan. 2020).

14

The Court in *Virgin Mobile* considered whether an administrative order issued by the Kansas Corporation Commission ("KCC") violated 47 U.S.C. § 254(f), which provides:

> A state may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an *equitable and nondiscriminatory* basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within the State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that *do not rely on or burden* Federal universal service support mechanisms.

47 U.S.C. § 254(f) (emphasis added). The administrative order at issue required the plaintiff wireless provider, on both a retroactive and future basis (a) to report as retail revenue the subsidies that it received from the Lifeline program and (b) to pay a percentage of those Lifeline subsidies to the Kansas Universal Service Fund ("KUSF"). According to the District of Kansas, using ordinary, dictionary definitions of the words "rely" and "burden", the KCC order both relied on and burdened federal universal service support mechanisms. In particular, the Kansas court found that the KCC order was a "burden" because it would "disincentivize engagement in FUSF programs, because such disincentives decrease provision of telecommunications services and ultimately customer access to those services." *Virgin Mobile,* 447 F. Supp. 3d at 1091-92. Additionally, the Kansas Court held that the state assessment was inequitable and discriminatory under Section 254(f) because the order did not apply to all federal USF programs and it "disincentivizes provision of FUSF Lifeline service because the KCC Order imposes an addition[al] cost on providing Lifeline services." *See Virgin Mobile,* 447 F. Supp. 3d at 1095-97.

According to Tracfone and the Kansas court, "rely on" means "to depend on" *Virgin Mobile,* 447 F. Supp. 3d at 1090. However, the Prepaid Wireless Fee was a fixed amount ($0.98 or $1.01 during the audit period) per retail transaction in Maine. The Prepaid Wireless Fee did

not depend on any federal universal service support mechanism. Likewise, according to the Kansas Court, to "burden" federal universal service support mechanisms means "to place a load on" them. *Id.* The Kansas Court held that the KCC Order placed a load on federal universal service support mechanisms because such fees "disincentivize carriers like Tracfone from providing Lifeline service.

This Court finds no evidence in the record to suggest Tracfone was disincentivized from providing from providing Lifeline service at any time. Likewise, because Tracfone did not collect or remit Prepaid Wireless Fees on its Lifeline service during the audit period, subsidies provided to Lifeline subscribers have not been, and will not be used to pay the State's Prepaid Wireless Fee. Therefore, an assessment for the Prepaid Wireless Fee during the audit period could not "divert any federal Lifeline revenues" into Maine's USF fund as had happened in Kansas. Maine Statue does not require Tracfone, or any other Lifeline service provider, to use any of the federal Lifeline subsidy to pay the Prepaid Wireless Fee.

Similarly, the Prepaid Wireless Fee is not "inequitable" or "discriminatory." Tracfone asserts that the Prepaid Wireless Fee "improperly discriminates" against it because the fee amounts to a higher percentage of the total sale price of their Lifeline service than other providers. However, this is only the case because Tracfone provides its Safelink service for the exact price of the federal subsidy, $9.25 per month, and does not charge customers beyond that amount. Tracfone's business decision determines how much their service costs, and thus what the ratio is between the Prepaid Wireless Fee and the monthly cost of the service. Tracfone has not demonstrated that it has been discriminated against, nor disincentivized from providing Lifeline services. Further, Tracfone has failed to show that the Prepaid Wireless Fee discriminates against the class of wireless providers that offer Lifeline versus other universal

16

service programs. Tracfone does not offer sufficient evidence that other universal service programs avoid Prepaid Wireless Fees due to a lack of "retail transactions." The Court finds that the Assessor's assessment of the Prepaid Wireless Fee is not expressly preempted. Accordingly, Tracfone's Lifeline services were subject to the Prepaid Wireless Fee during the Audit Period[3]. Judgment on this issue is granted in favor of the Assessor.

IV.     **Tracfone's Lifeline Services are Subject to Service Provider Tax**

In addition to the Prepaid Wireless Fee, Tracfone contends that its Lifeline services were not subject to Service Provider Tax ("SPT") during the audit period. The SPT "is imposed on the value of" certain services sold in Maine. 36 M.R.S. § 2552(1) (2010 & Supp. 2016). Two services that were subject to the SPT during the Audit Period were the sale of "telecommunications services" and "ancillary services." *Id.* § 2552(1)(E), (L).

Telecommunications services means "the electronic transmission, conveyance or routing of voice, data, audio, video, or other information or signals to a point or between or among points." 36 M.R.S. § 2551(20-A)(Supp. 2020). More simply, telecommunications service is the ability to make and receive telephone calls, and also includes the ability to send and receive text messages. Ancillary services are "associated with or incidental to the provision of telecommunications services," such as directory assistance and voice mail service. 35 M.R.S. § 2551(1-C). Rather than taxing consumers, the SPT is "a levy on the seller" of services. 36 M.R.S. § 2552(2). However, the seller may choose to pass the tax along to its customers. *Id.*

Although "sale" is not defined in the SPT, the Law Court has recently held that a sale (defined for the purpose of imposing sales tax) is fundamentally an exchange of goods or

---

[3] The Court notes that in 2018, the Legislature amended parts of Titles 25, 35-A, and 36 to provide that federal Lifeline subsidies would no longer be subject to the Prepaid Wireless Fee, Service Provider Tax, or Sales Tax. *See* P.L. 2017, ch. 422. Chapter 422 became effective on January 1, 2019, and does not retroactively impact Tracfone's tax treatment during the Audit Period.

17

services for a price or consideration. *State Tax Assessor v. MCI Comme'ns. Servs., Inc.,* 2017 ME 119, ¶ 14, 164 A.3d 952. The taxable value of the sale is measured by the "sale price." 36 M.R.S. § 2552(2). Sale price is defined as the "total amount of consideration, including cash, credit, property and services, for which personal property or services are sold, leased or rented, valued in money, whether received in money or otherwise. . ." 36 M.R.S. § 2551(15) (Supp. 2016). Sale price "includes any consideration for services that are part of a sale," not including discounts allowed or taken on sales. *Id.* § 2551(15)(A). As previously noted, Maine Law includes all payments that a retailer receives for a taxable sale, whether the payments come from a purchaser or from a third party, even if the retailer receives multiple payments at different times. *See Flippo,* 2006 ME 62, ¶ 10, 898 A.2d 942; *Flik Int'l Corp,* 2002 ME 176, ¶¶ 19-21, 812 A.2d 974.

Tracfone again asserts that its Lifeline customers were not engaged in a "sale", and therefore Lifeline services during the audit period are not subject to SPT. However, Tracfone provided wireless telecommunications service to its Lifeline customers "for a price or consideration." Thus, those transactions were "sales." *See MCI,* 2017 ME 119, ¶ 14 164 A.3d 952. Likewise, those sales resulted in Tracfone providing customers with telecommunications services: the ability to make and receive calls through the use of a mobile handset or device. (Stip. ¶ 27). Lifeline customers also had access to ancillary services such as directory assistance and voicemail service. (Stip. ¶¶ 27, 30). Accordingly, the Assessor correctly imposed SPT on Tracfone's Lifeline sales during the audit period and judgment is granted in favor of the Assessor.

V.     **The Tax Treatment of Tracfone's Non-Lifeline Services is Not Properly Before the Court.**

18

Tracfone's final argument is that "BOTA's conclusion that Tracfone's non-Lifeline sales were subject to sales tax and not SPT should be upheld." (Resp. Mot. at 28). However, that issue was not properly before BOTA, and is not properly before this Court. The two final agency actions at issue are the Assessor's findings that during the Audit Period, Tracfone's Lifeline services were subject to: 1) the Prepaid Wireless Fee, and 2) SPT. Tracfone previously paid the assessed taxes/fees and interest to the extent the assessments involved its non-Lifeline sales, and has not challenged those amounts in this case. Thus, the Court does not reach whether Tracfone's non-Lifeline services are subject to SPT or sales tax, as this issue is not ripe for review.

### CONCLUSION

For the foregoing reasons, the Petitioner State Tax Assessor's Motion for Summary Judgment is granted. Tracfone's Lifeline service was subject to the Prepaid Wireless Fee and Service Provider Tax during the Audit Period. It follows, Respondent Tracfone's Motion for Summary Judgment is denied.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

4/7/2021

**DATE**

Hon. M. Michaela Murphy
**Justice, Maine Superior Court**

19

**State Tax Assessor**

     **v.**

**TracFone Wireless, Inc.**

| | |
|---|---|
| **State Tax Assessor** | Thomas Knowlton, AAG.<br>Kimberly Patwardhan, AAG<br>6 State House Station<br>Augusta, ME 04333 |
| **Tracfone Wireless, Inc.** | Jonathan Dunitz, Esq.<br><br>Verrill Dana, LLP<br>One Portland Square<br>Portland, ME 04101 |

STATE OF MAINE                                    BUSINESS AND CONSUMER COURT
CUMBERLAND, ss                                    BCD-AP-19-01

STATE TAX ASSESSOR

      Petitioner/counterclaim respondent

v.                                                **ORDER ON MOTION TO COMPEL**

TRACFONE WIRELESS, INC.,

      Respondent/counterclaim petitioner

Before the court is Tracfone Wireless, Inc.'s ("Tracfone's") Motion to compel the production of documents. The State Tax Assessor (the "Assessor") is represented by Assistant Attorney General Thomas A. Knowlton. Tracfone is represented by Attorneys Jonathan M. Dunitz and Brian T. Marshall.

**Background**

On September 6, 2019, Tracfone filed a motion to compel responses to its second request for production of documents. In its motion, Tracfone asks the court to order the Assessor to produce documents related to taxpayers that are similarly situated to Tracfone. Tracfone believes that these documents will furnish evidence that the Assessor has only recently begun levying a tax assessment upon payments made to telecom companies. Tracfone contends that this evidence is relevant to the current proceeding because it will show that the Assessor changed its policies and practices without providing taxpayers notice of the change as required by 36 M.R.S. § 112. Tracfone argues that a failure to provide notice of such a change in policy and practice would render invalid two July 28, 2016 tax assessments the Assessor levied upon Tracfone.

During the course of reviewing Tracfone's motion, the court discerned that a threshold issue exists regarding whether the Assessor's failure to comply with the notice provisions of 36

1

M.R.S. § 112 can provide an entity with a defense to a tax assessment. If it cannot, then it is not likely that the documents Tracfone has requested would lead to the discovery of admissible evidence. The parties consented to this procedure which would require the Court to determine first as a matter of law if the notice provisions created a defense to a tax assessment, and the Court ordered supplemental briefing. For the following reasons, the court agrees with the Assessor that section 112 does not create such a defense.

**Discussion**

36 M.R.S. § 112 provides

When a significant change has occurred in bureau policy or practice or in the interpretation by the bureau of any law rule or instruction bulletin, the assessor shall, within 60 days of the change, provide to [a] publishing entity or entities written notice, suitable for publication, of the change.

Tracfone argues that this language was intended to create a consequence for the Assessor's failure to provide notice. To support its argument, Tracfone points to section 112's use of "shall," the legislative history of section 112's enacting legislation, and the absence of language stating that section 112 does not affect the validity of an assessment.

For the purposes of this motion, the court assumes that a substantial change in Bureau practice, policy or interpretation has occurred. The issue this court must decide is whether section 112 prohibits the Assessor from assessing a tax because of the Assessor's failure to provide a written notice of the change to a publishing entity. This is a matter of statutory interpretation.

When interpreting a tax statute, the plain meaning of the statute controls if the statute is unambiguous. *Blue Yonder, LLC v. State Tax Assessor*, 2011 ME 49, ¶ 10, 17 A.3d 667. When an ambiguity exists, courts look to the legislative history of the statute to determine its meaning. *Id.* Courts seek to avoid "absurd, illogical or inconsistent results" when interpreting a statute and words in a statute "must be given meaning and not treated as meaningless and

superfluous." *Stromberg-Carlson Corp. v. State Tax Assessor*, 2001 ME 11, ¶ 9, 765 A.2d 566, 569. Courts, however, will not read additional language into a statute. *Id.*

The court does not discern any ambiguity in section 112. The language the parties dispute is the phrase "the assessor shall, within 60 days of the change, provide to [a] publishing entity or entities written notice, suitable for publication, of the change." While this language plainly directs the Assessor to provide notice of a substantial change within 60 days of the change, it does not prevent the Assessor from implementing the change if notice is not provided. This conclusion is bolstered by the fact that notice must only be provided after a substantial change in policy, practice or interpretation has occurred; notice is not required prior to the change taking effect.

Moreover, the plain language of section 112 provides no sanction or consequence for the Assessor's failure to provide notice. The court cannot read additional language into section 112 or create a remedy which is not supported by the plain language of the statute. *Stromberg-Carlson Corp.*, 2001 ME 11, ¶ 9, 765 A.2d at 569; *Bureau v. Staffing Network*, 678 A.2d 583, 590 (Me. 1996) (courts do "not create a remedy or penalty when a statute is silent regarding the sanction for failure of an agency to timely act"). The only remedy available for the Assessor's refusal to provide notice is an order requiring the agency to act. 5 M.R.S. 11001(2); *see also Guar. Trust Life Ins. Co. v. Superintendent of Ins.*, 2013 ME 102, ¶¶ 38-39, 82 A.3d 121. In this case, however, Tracfone is not seeking an order to requiring the agency to act. It is asking for an order prohibiting the Assessor from acting to assess the tax in question, and is effectively asking the Court to create a remedy which the Court has no authority to create.

The power of taxation is retained solely by the Legislature and the Legislature may not delegate it to other authorities. Me. Const. Art. IX, § 9; *Me. Milk Producers, Inc. v. Comm'r of Agric., Food & Rural Res.*, 483 A.2d 1213, 1220 n.10 (Me. 1984) (citing *Boston Milk Producers,*

3

*Inc. v. Halperin*, 446 A.2d 33, 40 (Me. 1982)). Whether Tracfone, or any other entity, is subject to a tax is dependent upon the language of the taxing statute and not the rules, policies or practices of the Tax Assessor. *See Hudson Pulp & Paper Corp. v. Johnson*, 147 Me. 444, 448, 88 A.2d 154, 156 (1952). Thus, it is the acts of the Legislature which provide notice to entities of their tax liability and not the practices, policies, or interpretive guidance offered by the Assessor. *Cmty. Telcoms. Corp. v. State Tax Assessor*, 684 A.2d 424, 427 (Me. 1996); *see also Blue Yonder, LLC v. State Tax Assessor*, 2011 ME 49, ¶ 6, 17 A.3d 667 (the Assessor is not accorded any deference when interpreting tax statutes). Finally, the Assessor is not prevented from enforcing the tax laws of the State of Maine simply because of its prior failure to enforce the law or because of its inconsistent interpretation of the law. *Cmty. Telcoms. Corp.*, 684 A.2d at 427 (collecting cases); *Stewart Title Guar. Co. v. State Tax Assessor*, 2009 ME 8, ¶ 35, 963 A.2d 169.

**Conclusion**

The plain language of 36 M.R.S. § 112 does not prohibit the State Tax Assessor from enforcing the Tax Laws of the State of Maine even though the enforcement may represent a significant change in policy, practice, or interpretation, and even if the Tax Assessor failed to provide notice of such a change. Consequently, the Assessor's failure to provide notice in accordance with section 112 does not provide an entity with a defense to a tax assessment. In light of this, the information concerning other taxpayers which Tracfone seeks in its second request for the production of documents does not appear to be relevant to the subject matter of this litigation and is therefore not subject to discovery. M.R. Civ. P. 26(b)(1); *Strong v. Brakeley*, 2016 ME 60, ¶ 14 n.5, 137 A.3d 1007.

**The entry is**

**Tracfone Wireless, Inc.'s Motion to Compel is DENIED.**

**Date:    2/3/2020**                                    **_____/s_____**
                                                                    **M. Michaela Murphy**
                                                                    **Justice, Business and Consumer Court**

**State Tax Assessor**

      **v.**

**TracFone Wireless, Inc.**

| | |
|---|---|
| **State Tax Assessor** | Thomas Knowlton, AAG.<br>6 State House Station<br>Augusta, ME 04333 |
| **TracFone Wireless, Inc.** | Jonathan Dunitz, Esq.<br>One Portland Square<br>Portland, ME 04101 |